# Illinois Official Reports

## Appellate Court

<hr>

### *In re Marriage of Woodrum*, 2018 IL App (3d) 170369

<hr>

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF GREGORY W. WOODRUM, Petitioner-Appellee and Cross-Appellant, and JENNIFER L. WOODRUM, Respondent-Appellant and Cross-Appellee. |
| District & No. | Third District<br>Docket No. 3-17-0369 |
| Filed | September 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, No. 15-D-83; the Hon. William E. Poncin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Emily Sutton, of Lucie, Scalf, Sutton & Bougher, of Macomb, for appellant.<br><br>Stanley L. Tucker and Carissa Ann Bryant, of Tucker, Hartzell & Bryant, of Carthage, for appellee. |
| Panel | PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Schmidt and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1 Prior to their marriage, petitioner, Gregory W. Woodrum (Greg), and respondent, Jennifer L. Woodrum, executed a prenuptial agreement. After eight years of marriage, Greg filed a petition for dissolution of marriage. During the pendency of the proceedings, the trial court awarded Jennifer temporary maintenance and, subsequently, found the parties' prenuptial agreement was valid and enforceable. On appeal, Jennifer argues (1) the prenuptial agreement was not valid and enforceable and (2) the trial court prematurely entered a judgment without properly addressing "the issue of property." On cross-appeal, Greg argues the trial court erred by awarding temporary maintenance to Jennifer. We affirm.

¶ 2                                                      FACTS

¶ 3 In 2001, Greg and Jennifer began a relationship, and Jennifer moved into Greg's home shortly thereafter. Each party had been previously divorced twice and each had two children from their prior marriages. When Greg and Jennifer spoke of getting married, the discussions included executing a prenuptial agreement. Prior their marriage, the parties executed an "Agreement Prior to Marriage" (premarital agreement) on June 13, 2007. Greg and Jennifer married on July 29, 2007. Eight years later, on September 16, 2015, Greg filed a petition for dissolution of marriage. Greg was 58 years old and Jennifer was 61 years old at that time. No children were born out of their marriage.

¶ 4                                            I. Temporary Relief

¶ 5 On November 6, 2015, Jennifer filed a petition for temporary relief for Greg to maintain her health insurance and provide a vehicle and temporary maintenance during the proceedings. In response, Greg argued that the parties' premarital agreement precluded an award of temporary maintenance. He further argued that the premarital agreement could not be circumvented because Jennifer could not prove that she was entitled to maintenance due to an undue hardship that was not reasonably foreseeable at the time of the execution of the premarital agreement, as required to negate the terms of the premarital agreement under section 7(b) of the Illinois Uniform Premarital Agreement Act (Illinois Premarital Agreement Act). See 750 ILCS 10/7(b) (West 2016) (providing that if a premarital agreement modifies or eliminates spousal support that would cause a party "undue hardship in light of circumstances not reasonably foreseeable at the time of the execution of the agreement, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid such hardship").

¶ 6 On February 1, 2016, Jennifer amended her petition for temporary relief arguing that the terms of the premarital agreement only precluded maintenance "upon divorce or dissolution of marriage" and, alternatively, even if the premarital agreement precluded temporary maintenance, she should be awarded temporary maintenance pursuant to section 7(b) of the Illinois Premarital Agreement Act because eliminating temporary maintenance would cause her undue hardship in light of the unforeseen circumstance of Greg instructing her to leave his home as a result of her attending religious services as a Jehovah's Witness. Jennifer claimed that an undue hardship would result because her client relationships and book of business related to selling insurance had lapsed with Greg's knowledge and for his benefit of being able to help raise his children and take care of domestic duties.

¶ 7        In response to Jennifer's amended petition, Greg indicated that he earned a substantially higher income than Jennifer because Jennifer was "unemployed by choice." He denied Jennifer's business relationships and book of business had lapsed "for his benefit" and denied that Jennifer had no way to support herself. Greg admitted that the reason he told Jennifer to leave the home was because she was attending religious services at the Jehovah's Witness Kingdom Hall but contended that prior to their marriage Jennifer had told him that she was no longer a Jehovah's Witness. Greg further denied that Jennifer had been out of the workforce for a number years, indicating that she had worked at a grocery store in the summer of 2015 but had turned down an employment offer at a store located in Macomb, Illinois.

¶ 8        In determining whether to grant Jennifer's request for temporary relief, the trial court heard evidence and both parties submitted financial affidavits. Greg's financial affidavit, submitted as of June 16, 2016, showed that his income was $70,241 the previous year, his gross salary was $5720 per month, his monthly interest and dividend income was $222.83, and his monthly partnership income was $638.50. He had a First State bank account (only in his name) with $2000, investments were worth $28,000 (with Edward Jones and AG Edwards), his home was worth $230,000, and he had three vehicles—a 1964 Nova, a 1969 Camaro, and another 1969 Camaro, worth $35,000, $28,000, and $25,000, respectively. He also had a 20% interest in his family's business, Woodrum Automotive, Inc. (Woodrum Automotive), a pension worth $181,000, and an individual retirement account (IRA) (DWS Trust) worth $3000. Greg had transferred or sold his interest in, or the assets or property of, Wayne Woodrum, Inc., on March 3, 2014, for $350,868.

¶ 9        There was no court reporter during the proceedings, but the trial court subsequently certified a bystander's report submitted by Greg. According to the bystander's report, Jennifer testified that she was selling insurance when she moved in with Greg in 2001. Jennifer was still selling insurance at the time of the parties' marriage in 2007, but Jennifer had been decreasing her workload over time. Jennifer never specifically told Greg that she was going to quit selling insurance. Jennifer moved out of Greg's home in 2015, and in early 2016 she had begun working part-time at a grocery store but quit after a few months and had not looked for another job. Jennifer acknowledged that she had negotiated marital settlement agreements in both of her prior divorces. Jennifer also acknowledged that she entered into the prenuptial agreement with Greg but testified that she was not aware that C. Don Weston was her attorney at the time.

¶ 10       Weston testified that Jennifer had consulted with him regarding the impact and consequences of her premarital agreement with Greg. Weston's normal practice and custom was to review everything in the agreement with his client. Weston spent 1.5 hours over the course of two meetings with Jennifer regarding the prenuptial agreement. It was Weston's opinion that under the agreement the parties had waived maintenance under all circumstances, including temporary maintenance. Weston believed that Jennifer understood the contents of the prenuptial agreement.

¶ 11       Greg testified that when he and Jennifer had married in 2007, his two children were 20 and 23 years old and were out of the home. While Jennifer's work dwindled over time, Greg had never told Jennifer to quit her job. Executing a premarital agreement was something that Jennifer and Greg discussed from the beginning of their relationship in 2001.

¶ 12       The trial court granted Jennifer's request for temporary relief, finding that under the premarital agreement the parties had only waived maintenance "upon dissolution"—not upon the filing of a petition for dissolution of marriage. Jennifer was awarded $1137 per month in

temporary maintenance.

## II. Validity of the Prenuptial Agreement

On November 23, 2016, a hearing began regarding the validity of the parties' prenuptial agreement. The following evidence was presented.

## A. Prenuptial Agreement

The prenuptial agreement indicated, in pertinent part, as follows:

"RECITALS

WHEREAS, the Parties have exchanged promises to marry and intend to solemnize the same in the near future; and

WHEREAS, each of the parties individually holds certain property, and owes certain debts, the nature, extent, and estimated value of which has been fully disclosed to the other party (as set forth in the attached schedules); and,

WHEREAS, the Parties desire and intend to define their respective rights in the property of the other, both during the marriage relationship and after its termination, and to avoid such interests which, except for the operation of this Agreement, each might acquire in the property of the other as incidents of their marriage relationship; and,

WHEREAS, each Party desires that his or her respective property, both real and personal, shall pass to his or her designated beneficiaries.

GENERAL STATEMENTS OF INTENTIONS: *** [T]he parties, generally state their intentions for this Agreement as follows:

a. While the parties fully intend to commit themselves to achieving a successful long-term marriage and intend and desire to provide fairly and reasonably for the support of each other, each party is personally aware of the practicalities and realities of life, together with the time and financial and emotional cost involved in the unfortunate event of a legal proceeding concerning the parties' separation or dissolution. Each party intends, by entering into this Agreement to minimize that time, financial and emotional cost involved in the event of a future separation or dissolution of marriage between them.

* * *

IT IS, THEREFORE, AGREED:

1. DISCLOSURE OF PROPERTY

A full and complete disclosure of all property owned by the Parties, both real and personal, tangible and intangible, and all debts has been made to each other, and schedules of the respective property and debts of each Party are attached hereto as Exhibit A for Husband and Exhibit B for Wife, and are hereby incorporated by reference.

2. RELEASE OF MARITAL RIGHTS

Except as herein otherwise provided, the property of the Parties, as listed in their respective schedules attached hereto and made a part hereof as Exhibits A and B, together with any property which they may have omitted inadvertently therefrom, any

- 4 -

property they may hereafter acquire \*\*\* and all interest, rents, profits, and increased value which may in time accrue or result in any manner, or any other property or interest in property owned by either Party, shall be owned as separate property of such Party during marriage. It is specifically understood and agreed that said property and any property acquired in the separate name of either party after the marriage shall be "non-marital" property. Each Party hereby waives, discharges, and releases all right, title, and interest in and to the property of the other Party now owned, hereafter acquired, or acquired from the proceeds of any property now owned.

\*\*\* [A]ny appreciation of such separate property shall also be deemed separate property, whether or not this appreciation in value is due to improvements made directly or indirectly by the contribution of either party's labor, separate funds, or separate property, to the property of the other. \*\*\* [A]ppreciation in value of any of the property described in this paragraph shall not be considered in making any division of any marital property of the marital estate, if any there be, upon a divorce or dissolution of marriage, except herein provided.

Each Party shall have the absolute and unrestricted right to manage, control, dispose of, or otherwise deal with such separate property free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

Husband and Wife do hereby covenant and agree that any property now owned or conveyed by either party to this agreement to the other, or hereafter acquired by Husband and Wife, as tenants by the entirety or joint tenants with right of survivorship or which is held in the name of one as a trustee for the benefit of the other, or in which the Parties are co-owners, survivors, or named beneficiary, or held in tenancy in common, shall, upon divorce or dissolution of marriage, be awarded to each in proportion to the contribution of their separate funds to the acquisition of such property.

\* \* \*

### 6. NO LIMTIATION ON TRANSFERS TO EACH OTHER DURING LIFE

Nothing in this Agreement shall affect the right of either Party voluntarily to transfer real or personal property to the other, or the right to receive property so transferred by the other, during their lifetime.

In the event either Party invests in or contributes money or funds toward property of the other Party, in the event of a divorce, the Party so investing shall be entitled to a credit or refund of such amount less depreciation, if appropriate.

\*\*\*

### 8. MAINTENANCE

In consideration of the promises and marriage of the Husband and Wife in this Agreement, the Husband and Wife hereby declare that each is currently self-supporting. Each party states to the other that their educational background and work experience have allowed them to acquire valuable and readily marketable employment skills and their separate assets, and that by virtue of those skills and assets both are able to support themselves through appropriate employment or business and are possessed of sufficient income, each to provide for their own support. Husband and

Wife, therefore, hereby waive from the other all right to maintenance for themselves from the other under the laws of the State of Illinois or any other state in which either party may hereafter reside upon divorce or dissolution of marriage contemplated by this Agreement. This waiver of maintenance shall be binding on each.

9. DISSOLUTION OF MARRIAGE OR SEPARATION

Each of the Parties hereto, by the execution of this Agreement, intends that the provisions of this Agreement shall be binding upon each of them and their heirs in the event of dissolution of marriage or a separation by and between the Parties.

\*\*\*

11. REPRESENTATION BY COUNSEL

The Parties do hereby admit and acknowledge that Husband has been represented by Stanley L. Tucker and Hartzell, Glidden, Tucker & Hartzell and that Wife has been represented by C. Don Weston"

¶ 17    Greg's written disclosure attached to the parties premarital agreement was as follows:

"1. Residential Real Estate described as follows:

913 Oakview Dr. Macomb, Il.

2. Checking Accounts

First State Bank [account number] 15,000

3. Investments: Edward Jones

IRA DWS Trust

Smith Barney Retirement

Private Ledger

4. Pensions:

IADA Nadart 150,000.00

5. Vehicles:

1964 Nova

1969 Camaro

½ equity in 2002 Mustang

6. Household goods and furniture:

Couch

Chair

3 Beds

7. Other:

Farm in Tallula and in Macomb

Cash on hand 120,000.00

Debts:

1. National City Mortgage 50,000.00"

¶ 18    Jennifer's written disclosure attached to the prenuptial agreement as exhibit B, showed that she owned no residential real estate; she shared a joint checking account with Greg at First State Bank (exact balance unknown and no account number listed); she had investments worth almost $50,000; she had an IRA valued at $5770; she owned a 2002 Ford Mustang GT in joint

tenancy with Greg (no value given); she owned a bedroom set, couch, love seat, television, kitchen set, and ironstone; and she had a cat. Jennifer listed no debt.

¶ 19                                    B. Testimony of Jennifer Woodrum

¶ 20    Jennifer testified she began a romantic relationship with Greg in 2001 and, shortly thereafter, moved into his home in Macomb, Illinois. Prior to their marriage, Greg had been responsible for the couple's finances, which continued after they were married. Jennifer never saw the bills. Jennifer initially testified that she did not have any knowledge of Greg's ownership interest in the Woodrum business prior to their marriage. She knew Greg had inherited some farmland after his grandfather's death, but she did not remember the amount of acreage or the value of the farmland. She did not recall in what town the farmland was located but knew that it was "on the way to Springfield." She did not know Greg had an interest in farmland in both Macomb and Tallula, Illinois.

¶ 21    In testifying in regard to Greg's financial disclosure, Jennifer indicated that she had not been involved in the purchase of Greg's home, did not know the value of the home, did not know whether there was a mortgage on the home, and did not know the amount of the mortgage payments, if any. Although an account number was indicated, Jennifer did not recognize the $15,000 First State Bank checking account listed on Greg's disclosure and did not know whether it was the same account as their First State Bank joint checking account listed in her disclosure. Prior to their marriage, Jennifer did not know Greg had investments with Edward Jones, as was listed on Greg's financial disclosure and she did not know the value of those investments. She was also not aware of Greg's $150,000 pension, which was listed on his written disclosure. Jennifer did not know about Greg's assets or investments with Northwestern Mutual Life Insurance or Maedco (indicated on the parties' 2007 joint tax return), which had not been included on Greg's written disclosure. Greg's written disclosure also did not indicate his ownership interest in Woodrum Automotive or Wayne Woodrum, Inc. (his family's businesses). Jennifer knew that Greg owned the vehicles and furniture listed on his disclosure.

¶ 22    Jennifer testified that it was Greg's decision to have the premarital agreement drawn up and she did not have any input regarding its contents. She signed the agreement because Greg indicated that she would have to sign some paperwork prior to their marriage. Jennifer testified that she signed the agreement in Weston's office about a week before she and Greg were married. Jennifer did not hire Weston to represent her, and she believed that Weston was Greg's attorney. She was not aware that Tucker represented Greg. When Jennifer went to Weston's office to sign the agreement, she told Weston "what [she] was there for" and handed him her financial paperwork that Greg had told her to bring to Weston. Weston then produced the premarital agreement and turned to the signature page, and she signed the agreement. She testified, "[t]here was no conversation about it so we didn't review anything." Prior to signing the agreement, Jennifer was not given the opportunity to review Greg's written disclosure or her own written disclosure, which should have been attached as exhibits A and B, respectively. Jennifer discovered that Weston had been her attorney after Greg filed for divorce and she received an e-mail from her divorce attorney with a copy of the premarital agreement that indicated she was represented by Weston and Greg was represented by Tucker.

¶ 23    Jennifer testified her written disclosure was accurate and complete. She explained the joint checking account listed on her disclosure had been funded with her money and was "just an

account that was necessary to have checks with both of [their] names on it in order for [her] to be part of the Country Club" before they were married.

¶ 24 By the time Greg and Jennifer married, Jennifer was not selling as much insurance because she was "taking care of the household chores" and unable to work every day and unable to get new leads. Gradually, Jennifer's sales "just dwindled." The decision to cut back on her work was solely Jennifer's decision. Greg did not object to Jennifer reducing her workload.

¶ 25 Upon cross-examination, Jennifer testified that she had no knowledge of Greg's ownership interest in his family's business. She then testified that she knew about Greg's ownership interest at the time she signed the premarital agreement but did not know the percentage of that ownership interest. Prior to their marriage, Greg had mentioned wanting a prenuptial agreement "a few times." Jennifer testified she only met with Weston on one occasion. She did not ask to read the prenuptial agreement and did not read the agreement prior to signing it. If Greg had indicated in the agreement that he owned a particular percentage of Woodrum Automotive, she would not have known because she did not read the agreement.

¶ 26 Jennifer testified that she had been licensed to sell insurance since 1987. She confirmed that she had sold various insurance policies—cancer, intensive care, hospital indemnity, and life insurance. Jennifer was familiar with the policies she sold, and she was able to explain those policies to her customers. Some of the policies were complicated. She met with hundreds of individuals in trying to sell insurance policies over the years. Greg did not ask her to reduce her work activity, and she did not tell him that she was doing so. Jennifer had reduced her work activity because she was doing work around the house and she could not "put forth the 100 percent into [her] work in order to make the money [she] was." At the time she executed the premarital agreement, Greg's children were in college but Jennifer was still doing laundry for them, getting meals, and doing the housework.

¶ 27 Jennifer had been married twice prior to her marriage to Greg. In 1987, Jennifer had signed a marital settlement agreement with her first husband, in which they agreed to a property settlement and a waiver of maintenance. Jennifer did not remember if she read the 1987 agreement prior to signing it. She testified that maintenance was not an issue in that divorce and it was never discussed, but she acknowledged that, based on the 1987 settlement agreement, she would receive no maintenance from her first husband. In 1996, Jennifer and her second husband entered into a separation agreement in which both parties waived support and maintenance and disposed of the marital property and debts. Jennifer could not recall if she had read the 1996 separation agreement prior to signing it. Jennifer had filed for divorce from her second husband three months after they married and they had never lived together or commingled their assets. In both the 1987 settlement agreement with her first husband and the 1996 separation agreement with her second husband, Jennifer understood that she would not receive support as a result of her waiver of maintenance.

¶ 28 Greg's attorney also called Jennifer to testify as an adverse witness. Greg's attorney read Jennifer's deposition testimony in which she testified that, in 2001, Greg worked at Woodrum Automotive, and she assumed he was an owner. When asked at what point in their marriage she assumed Greg was an owner, she indicated that it was when they had started living together.

¶ 29 Jennifer testified that she had gone to Weston's office one time by herself and spent 40 minutes there, during which time she signed the prenuptial agreement. Greg had told her that she needed to go to Weston's office to get the paperwork signed. Weston did not ask Jennifer

to read the premarital agreement. Jennifer denied that after her meeting with Weston she went home and told Greg that she was aggravated because Weston had gone over every line of the agreement.

¶ 30     Jennifer and Greg discussed executing a premarital agreement as part of their conversation about getting married. She denied that it was discussed "many times" and indicated "[i]t was just part of the conversation." It was discussed more than once because Greg urged her to go sign the "paperwork." She expected that to mean that she would waive any claim to Greg's property and that she would not get maintenance.

¶ 31                               C. Testimony of Greg Woodrum

¶ 32     Greg testified that although the parties' 2007 joint tax return indicated that $5576 of interest had been earned from Maedco and $40 from Northwestern Mutual Life Insurance Company, he did not know what Maedco was and did not recall why he earned interest from the Northwestern Mutual Life Insurance Company. He explained that it could have been from "stuff that we got for the kids" or his dad "might have done it and put it in his name." Greg did not know because they "just ha[d] the accountants take care of it." He testified that the $536 of reported income from his 20% interest in Woodrum Automotive must be accurate because "the accountants just take care of that" but he did not actually receive any of that money. He did not know about the long-term gain for the $7054 sale of Illinois Dealers Life Insurance Company or the $10,662 for an installment sale of "property used in a trade or business." Greg "doubted" that the sale pertained to the sale of any farmland because he had a remainder interest and his father had a life estate in the farmland. Greg's father, Wayne, was still alive. Greg testified that he lived off his weekly income, and if there was "anything" from the farm or the automotive dealership, he "never received any money on that." Greg acknowledged that the parties' 2007 tax return referenced income and losses of a partnership in an S corporation—Woodrum Automotive—and his 2007 W-2 showed that he was employed by Wayne Woodrum, Inc. Greg testified that in 2007 (when the premarital agreement was executed) he owned a 20% interest in both Woodrum Automotive and Wayne Woodrum, Inc. Wayne Woodrum, Inc. sold on March 3, 2014, for $350,868, but Greg did not receive any of the sale proceeds and did not know if the $350,868 was for the sale of his 20% interest or the company as a whole. Greg had been listed as an owner of Wayne Woodrum, Inc., because he was made the dealer of the auto dealership and had to be a 20% percent owner to do so. Greg explained that there was an early entity of Wayne Woodrum, Inc., and there was also Woodrum Automotive, Inc. He did not actually "own" his 20% interest in either business, despite it being documented that way, and he never paid anything or received anything for his interest. Woodrum Automotive became Greg's employer after the sale of Wayne Woodrum, Inc.

¶ 33     Greg testified that, in 2007, Jennifer knew exactly what his interest was in his family's business and that he had told her many times. Greg testified that his father received the income from the Tallula farmland for the duration of his father's life and then the remainder interest would go to Greg and his brother. The Macomb farmland was placed into the names of Greg, Greg's brother, and Greg's father because his father's age was "getting up there." Greg's father handled the business matters related to the family business and the farms, and Greg took care of the day-to-day operations of the auto dealership.

¶ 34     In regard to the prenuptial agreement, Greg consulted his attorney (Tucker), who drafted the agreement and Greg reviewed it. Tucker advised Greg that it would be best if Greg and

Jennifer were each represented by their own attorneys. Weston represented Jennifer as a result of Weston being a customer, Jennifer not having a preference for who would represent her, and Greg and Jennifer wanting someone "good and reputable." Greg told Jennifer that "he would never ever get married again unless [he] had a prenuptial [agreement]." Greg testified that his exact words to Jennifer were that he had lost a house and property before and he did not want it to ever happen again. Greg testified, "she knew exactly that and we talked about it many times." Greg testified that the first time Jennifer went to Weston's office, Greg had gone with her. The second time Jennifer met with Weston, Jennifer went by herself upon instruction from Weston that she had to meet with him by herself. When Jennifer came home from the second meeting with Weston, she was "all perturbed" at Weston for reviewing every word of the premarital agreement with her at least twice. Once Jennifer and Greg received the final draft of the premarital agreement from Greg's attorney, they went to the bank together and signed it before a notary public. Greg did not have a specific recollection of preparing his written disclosure and assumed that his attorney asked for information and he wrote information down on a piece of paper.

¶ 35                              D. Testimony of Ben McMahon

¶ 36    Ben McMahon testified that he had been a certified public accountant since 1975 and the Woodrum businesses had been his client for the past 15 or 20 years. In handling the tax work for the Woodrum businesses, McMahon dealt almost exclusively with Wayne (Greg's father). Greg never gave McMahon any information. McMahon never had any occasion to discuss tax matters about the business with Greg at any time. Greg would not have had any knowledge about the corporate tax returns, which were always sent to Wayne. Wayne, Greg, and Greg's brother reported land sale on their taxes, but McMahon did not know if any of the proceeds were distributed to Greg or Greg's brother. To the best of McMahon's memory, the money went into the farm account to pay down debt. Income from the farmland was only reported on Wayne's tax returns.

¶ 37                          E. Jennifer's Attorney—C. Don Weston

¶ 38    Weston testified that he had been practicing as an attorney in McDonough County for 55 years. His records indicated that on April 23, 2007, he spent one hour conferring with Jennifer and Greg and reviewing their prenuptial agreement. On May 9, 2007, Weston spent 1½ hours reviewing the prenuptial agreement and conferring with Jennifer. In accordance with his normal practice, Weston would have reviewed the prenuptial agreement with Jennifer and would have discussed the issue of maintenance, the release of marital rights, and the issue of marital property. Weston did not read the agreement to Jennifer, but she was allowed to the read agreement. At the conclusion of the meeting, Weston was confident that Jennifer understood the agreement because he would have counseled her not to sign the agreement if she had not understood it. Weston had no further contact with Jennifer after May 9, 2007. At the time of the meeting on May 9, 2007, Weston had no knowledge of Greg's assets because Weston and Jennifer did not have Greg's disclosure of assets at that time. According to Weston, it would be "difficult" to determine a true fair market value of Greg's remainder interest in the farmland.

¶ 39    Weston testified that on May 11, 2007, he sent a letter to Greg's attorney (Tucker) indicating that Jennifer had conferred with Weston about the premarital agreement. In the

letter, Weston requested Greg's financial disclosure and that a change be made to the parties' general statement of intentions in the third paragraph. Weston enclosed Jennifer's written disclosure with the letter. On June 5, 2017, Greg's attorney sent a letter to Greg with the revised prenuptial agreement and sent a copy sent to Weston. In the letter, Greg's attorney instructed Greg to add a list of his property as exhibit A and to have the agreement signed by both Greg and Jennifer before a notary public. The signatures to the agreement were executed or acknowledged by both parties before a notary public on June 13, 2007. In July 2007, Weston received a check from Woodrum Automotive for his services.

¶ 40                    F. Ruling on the Enforceability of the Agreement

¶ 41        On April 7, 2017, at a hearing on the bifurcated issue of the validity of the prenuptial agreement, the trial court ruled from the bench, finding the parties executed the prenuptial agreement prior to their wedding on June 13, 2007, with the agreement including a waiver of the right to maintenance. The trial court noted that at the beginning of the marriage Greg was employed in his family's automotive business and Jennifer was an insurance agent. The trial court noted that Jennifer had indicated that she had no knowledge of Greg's ownership interest in the Woodrum business at the time she signed the agreement but, after being reminded of her deposition testimony, she acknowledged knowing that he had an ownership interest. The trial court also noted that Greg told Jennifer several times of his business ownership and indicated that he lost a house and property in a prior divorce and did not want that to happen again. Jennifer had acknowledged that Greg requested a prenuptial agreement several times during their cohabitation. The trial court found that Jennifer voluntarily entered into the prenuptial agreement and waived any interest in Greg's property based upon evidence that (1) Jennifer had waived the right to spousal support in two previous marriages; (2) she was repeatedly informed on more than one occasion prior to the marriage that Greg wanted to protect his property through a prenuptial agreement; (3) Jennifer was represented by competent counsel; (4) even if Jennifer had not read the agreement prior to signing it, she had the opportunity to do so; (5) although the agreement did not contain the disclosures of Greg's property at the time Weston reviewed the agreement with her, Jennifer had sufficiently become aware of Greg's financial affairs during the six years she had lived with Greg; and (6) it was the intent of the parties to ensure each party left the marriage with what they brought into the marriage. The trial court found the prenuptial agreement was not unconscionable, noting Jennifer was represented by competent counsel and that the agreement was not inherently unreasonable. The trial court further noted that there was insufficient information to make a finding of undue hardship in light of circumstance not reasonably foreseeable at the time of the execution of the agreement to require Greg to provide support notwithstanding the terms of the agreement and continued the case for further proceeding "if the parties feel that they are, in fact, necessary."

¶ 42        On May 10, 2017, the trial court entered a written order, indicating that it had found (1) Jennifer voluntarily entered into the prenuptial agreement, (2) the agreement was not procedurally or substantively unconscionable, (3) Greg had made an adequate and reasonable disclosure of his property, and (4) the prenuptial agreement was valid and enforceable.

¶ 43                            III. Judgment of Dissolution

¶ 44        On May 15, 2017, Greg filed a motion for an entry of a judgment of dissolution of marriage and for the termination of all temporary orders. On May 26, 2017, Jennifer filed a motion to

certify questions for interlocutory appeal, regarding seven questions related to the enforceability of the parties' premarital agreement (namely, issues of substantive unconscionability and whether Greg's disclosure was fair and reasonable).

¶ 45    On May 30, 2017, at the hearing on Greg's motion for entry of judgment, Jennifer's attorney argued the entry of a judgment of dissolution would be premature because there had not been a final determination of property settlement. She argued that granting Jennifer's motion to certify questions for an interlocutory appeal was necessary so that the issues pertaining to the validity of the prenuptial agreement could be addressed before addressing the issue of property. Jennifer's attorney noted the parties' had joint property at the time they entered the prenuptial agreement, "so at the very least, there are a few, granted fewer, significantly fewer, assets to divide, but they had joint accounts, they owned joint property." The trial court asked, "[s]o you are representing to the Court that as of today, there are still unresolved property issues regarding marital property?" Jennifer's attorney responded, "correct," noting that a bank account and vehicle had been jointly owned by the parties at the time the premarital agreement was prepared. Jennifer's attorney indicated they would need to "do some tracing to determine support during the marriage and payment of bills and that sort of thing for the purpose of any contributions." Greg's attorney argued that Jennifer had not filed an objection to the motion for entry of a dissolution judgment and that, while there may have been joint property seven years ago, there was currently no joint or marital property that needed to be addressed.

¶ 46    The trial court noted that there had been "extensive discovery" and asked Jennifer's attorney, "as you sit here today, what property is marital property that is in dispute?" Jennifer's attorney responded that there had not been significant discovery because discovery had been limited to issues of temporary maintenance and the validity of the premarital agreement. The trial court noted that depositions had been taken and issues of marital property had not been raised in the context of those depositions. Jennifer's attorney agreed, but argued that Jennifer was entitled to "some sort of accounting and some sort of contribution for various financial machinations that occurred during th[e] seven years of marriage." Greg's attorney argued that the premarital agreement specifically provided that anything acquired during the marriage was nonmarital property and there was no indication that any marital property existed.

¶ 47    The trial court denied Jennifer's motion to certify questions for an interlocutory appeal, terminated all temporary orders, and entered a judgment of dissolution. The order of judgment for dissolution incorporated the prenuptial agreement and noted "both parties have entered into a valid prenuptial agreement that dictates the disposition of the parties' property, and all property of the parties is non-marital."

¶ 48    Jennifer appealed and Greg cross-appealed.

¶ 49                                         ANALYSIS

¶ 50    On appeal, Jennifer argues (1) the prenuptial agreement was not enforceable and (2) the trial court prematurely entered the dissolution judgment without properly addressing "the issue of property." On cross-appeal, Gregory argues that the trial court erred by awarding temporary maintenance to Jennifer during the pendency of the dissolution proceedings.

¶ 51                                I. Validity and Enforceability of the Prenuptial Agreement

¶ 52        Jennifer argues that pursuant to section 7(a)(2) of the Illinois Premarital Agreement Act (750 ILCS 10/7(a)(2) (West 2016)), the parties' prenuptial agreement was not enforceable because it was unconscionable when it was executed and before its execution (1) Greg failed to provide her with a fair and reasonable disclosure of his property, (2) she did not execute a written waiver of a disclosure, and (3) she did not have adequate knowledge of Greg's assets. In addressing this issue, we must interpret language of the Illinois Premarital Agreement Act. See 750 ILCS 10/1 *et seq.* (West 2016).

¶ 53        We review *de novo* the construction and application of a statute. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Id.* The best indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *Id.* In determining the plain meaning of statutory terms, we consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting the statute. *Id.* When the statutory language is clear and unambiguous, we must apply the language as written, without resort to extrinsic aids to determine its meaning. *Id.* When the statutory language is ambiguous, we construe the statute to avoid rendering any part meaningless or superfluous. *Id.* We do not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *Id.*

¶ 54        In 1989, the Illinois legislature adopted the Illinois Premarital Agreement Act (750 ILCS 10/1 to 11 (West 2016)), which was modeled after the Uniform Premarital Agreement Act (UPAA) (Unif. Premarital Agreement Act (Unif. Law Comm'n 1983)). The UPAA had been approved by the National Conference of Commissioners on Uniform State Law and was designed to address problems with the uncertainty regarding the enforceability of premarital agreements.[1] See Unif. Premarital Agreement Act, Prefatory Note (Unif. Law Comm'n 1983).

_____

[1]The Alaska Supreme Court in *Brooks v. Brooks*, 733 P.2d 1044, 1048 (Alaska 1987), discussed the evolving public policy considerations regarding prenuptial agreements. The traditional common law view was that prenuptial agreements were inherently conducive to divorce and allowed a husband to circumvent his legal duty to support his wife. *Id.* Thus, prior to 1970, prenuptial agreements that stipulated terms regarding alimony and property settlements upon divorce were almost universally considered void *ab initio* as contrary to public policy. *Id.* at 1048-49; *cf. Dickason v. English*, 272 Ill. 368, 371 (1916) (in Illinois prior to 1970, it was settled that persons having legal capacity to contract may make a valid premarital agreement and such an agreement was not considered to be contrary to public policy). Since 1970, public policy changed and the traditional rule gave way to the view that prenuptial agreements were valid and enforceable if certain standards of "fairness" were met, with the standards varying from state to state. *Brooks*, 733 P.2d at 1049. As divorce became more commonplace, there was an increase of second and third marriages—often of mature people with substantial means and separate families from earlier marriages, who "may not be willing to risk marriage again without the ability to safeguard their financial interests." *Id.* at 1050. "[W]ithout the ability to order their own affairs as they wish, many people may simply forgo marriage for more 'informal' relationships." *Id.* In drafting the UPAA in 1983, the commissioners at the National Conference of Commissioners on Uniform State Laws debated between the majority of the commissioners' view in favor of certainty of the enforcement of premarital agreements and the minority's view of protecting against substantive unfairness at the time of enforcement. *In re Marriage of Bonds*, 5 P.3d 815, 823-24 (Cal. 2000) (citing National Conference of Commissioners on Uniform State Laws, Proceedings in Committee of the Whole, Unif. Premarital Agreement Act (July 23-26,

The Illinois legislature, similarly, enacted the Illinois Premarital Agreement Act to allow for more consistency by courts in determining the validity of premarital agreements than had been the case under Illinois common law.[2, 3] The Illinois Premarital Agreement Act became effective on January 1, 1990. 750 ILCS 10/1 *et seq.* (West 2016).

¶ 55 The enactment of the Illinois Premarital Agreement Act brought about significant changes in relation to the enforcement of premarital agreements. See 750 ILCS 10/1 *et seq.* (West 2016). The Illinois Premarital Agreement Act allows parties to waive or modify their marital rights by entering into a valid premarital agreement, with limited grounds provided to find the agreement to be unenforceable.[4] *In re Marriage of Best*, 228 Ill. 2d 107, 118 (2008); 750 ILCS

---

1983), at 49-97 (Proceedings, Uniform Act)). Under the resulting language adopted in the UPAA, unconscionability could only be raised if the party against whom enforcement was sought could show that at the time of execution of the premarital agreement there had been a lack of disclosure of assets, lack of a waiver of the disclosure, and a lack of imputed knowledge of assets. *Id.* at 824 (citing Proceedings, Uniform Act, *supra*, at 49-97, 131).

[2]In April 1989, Senator Barkhausen sponsored Senate Bill 552 for the enactment of a statute pertaining to premarital agreements to provide "a statutory framework, rather than a guessing game, about where courts will stand" about the enforceability of premarital agreements "in an age with an increasing number of marriages between spouses who have previously been married, have children by the marriage, and have accumulated property prior to this second or subsequent marriage." 86th Ill. Gen. Assem., Senate Proceedings, May 22, 1989, at 121 (statements of Senator Barkhausen). Senator Geo-Karis stated that people with children from prior relationships should be "entitled to make a good prior premarital agreement with each other" and to avoid "the ups and downs on premarital agreements that we have now." 86th Ill. Gen. Assem., Senate Proceedings, May 22, 1989, at 122-23 (statements of Senator Geo-Karis). Senator D'Arco noted that the proposed language required "full disclosure of all property and financial obligations," and Senator Barkhausen acknowledged, "the bill does require a full financial disclosure." 86th Ill. Gen. Assem., Senate Proceedings, May 22, 1989, at 123 (statements of Senators D'Arco and Barkhausen). Senate Bill 552 was assigned to the judiciary committee and a subsequent motion to discharge the judiciary committee was lost, with no further action taken on the bill. On June 22, 1989, Senator Barkhausen moved to amend House Bill 470 (a bill related to the emergency orders of protection) for the adoption of the language of the UPAA (with a modification suggested by the bar associations) because premarital agreements were becoming more commonplace and current enforcement of premarital agreements was "unpredictable." 86th Ill. Gen. Assem., Senate Proceedings, June 22, 1989, at 11 (statements of Senator Barkhausen). The Illinois Legislature adopted the provisions of the UPAA (as modified) and the Illinois Uniform Premarital Agreement Act was subsequently enacted.

[3]The only modification made by the Illinois legislature in adopting the language of the UPAA was to the enforcement section of the UPAA that had provided spousal support could be required, despite contrary terms in the premarital agreement, where the modification or elimination of spousal support would "cause one party to be eligible for support under a program of public assistance at the time of separation or marital dissolution." See Unif. Premarital Agreement Act § 6(b) (Unif. Law Comm'n 1983). Whereas, the Illinois Premarital Agreement Act provides that spousal support could be awarded, notwithstanding the terms of the premarital agreement, if the modification or elimination of spousal support "causes one party to the agreement undue hardship in light of circumstances not reasonably foreseeable at the time of the execution of the agreement." 750 ILCS 10/7(b) (West 2016).

[4]Under Illinois common law, premarital agreements were generally valid and enforceable as long as (1) an unforeseen condition of penury was not created due to lack of property resources or lack of employability; (2) the agreement was entered into with full knowledge and without fraud, duress, or

- 14 -

10/4(a)(3), (a)(4) (West 2016). By entering into a valid premarital agreement, parties agree that their enumerated rights at dissolution are no longer governed by applicable statutes where those rights are validly modified or waived in the agreement. *Best*, 228 Ill. 2d at 118. The Illinois Premarital Agreement Act omits the prior common law requirement that an enforceable agreement must also be fair and reasonable and must not result in an unforeseen condition of penury for the party challenging the agreement. *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 49. Thus, under the Illinois Premarital Agreement Act, a court cannot invalidate a premarital agreement merely because the enforcement of the agreement would result in a disproportionate allocation of assets to one of the parties. *Id.*

¶ 56        Section 7 of the Illinois Premarital Agreement Act governs the enforceability of premarital agreements, providing:

> "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
>> (1) that party did not execute the agreement voluntarily; or
>>
>> (2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:
>>
>>> (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>>>
>>> (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>>>
>>> (iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." 750 ILCS 10/7(a) (West 2016).

¶ 57        On appeal, Jennifer does not argue that she did not voluntarily sign the premarital agreement. Thus, there is no issue as to whether Jennifer made a knowing waiver of her marital rights. Consequently, the parties' premarital agreement is enforceable unless Jennifer was able to prove, pursuant to section 7(a) of the Illinois Premarital Agreement Act, that the agreement was unconscionable when it was executed *and* that, before execution, she was not provided a fair and reasonable disclosure of Greg's property and financial obligations, she did not voluntarily execute a written waiver of the disclosure, and she did not have, and could not have had, knowledge of those matters. See 750 ILCS 10/7(a) (West 2016).

¶ 58                                    A. Waiver

¶ 59        There was no waiver by Jennifer, in writing, to her right to disclosure of the property or financial obligations of Greg beyond the disclosure provided, even where she signed the agreement without reading it. Under the Illinois Premarital Agreement Act, the only way that Greg could have been relieved of his statutory obligation of providing a fair and reasonable disclosure was by Jennifer "voluntarily and expressly waiv[ing], in writing, any right to disclosure of the property or financial obligations of [Greg] beyond the disclosure provided."

---

coercion; and (3) the agreement was fair and reasonable. *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 299 (2005). A premarital agreement was fair and reasonable if it guaranteed both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance. *Id.* at 300.

See 750 ILCS 10/7(a) (West 2016). Jennifer did not execute such a waiver.

¶ 60                                   B. Fair and Reasonable Disclosures

¶ 61        Jennifer argues that Greg failed to provide a "fair and reasonable" disclosure where he failed to disclose his 20% interest in Wayne Woodrum, Inc.; his 20% interest in Woodrum Automotive; assets regarding Maedco, Northwestern Mutual Life, and Illinois Dealers Life Insurance that had generated in excess of $10,000 of income in 2007 (as indicated on the parties' 2007 joint tax return); the value of his residence; the value of his investments with Edward Jones; and the value and the acreage regarding his interest in the farmland.

¶ 62        Greg argues that he did, in fact, provide a fair and reasonable disclosure where both parties had acknowledged in the prenuptial agreement that they had made a "full and complete disclosure" to each other. Greg additionally argues that the only asset that was not disclosed was his ownership interest in the family automotive dealership, which "generated no actual income or cash value other than his regular salary for managing." He notes that although his 2014 tax return showed reported income from a sale of land, he did not receive any proceeds of that sale. He also contends that his failure to provide a value for his interest in the farmland was reasonable because his interest in the Tallula farmland was a remainder interest that he had not yet received, the value of a remainder interest was not easily able to be valued, and he did not know the value of the farmland in Tallula or Macomb.

¶ 63        First, we disagree with Greg that the parties' acknowledgement in the prenuptial agreement that they had each made "a full and complete disclosure" indicates his disclosure was fair and reasonable. While we acknowledge that parties are free to contract for the more stringent requirement of a full and complete disclosure, neither party argues they had intended to do so.[5] Greg's argument is, essentially, that by the parties both acknowledging that "full and complete" disclosures were made, Jennifer has waived her right to complain about the sufficiency of his disclosure. Greg's argument is misplaced because under the Illinois Premarital Agreement Act, he had statutory obligation to provide at least a fair and reasonable disclosure (unless Jennifer waived her right to such a disclosure, in writing, or she had adequate knowledge of his property and financial obligations). See 750 ILCS 10/7(a)(2) (West 2016). We must look to the disclosure actually made, and not the language of the agreement, to determine whether the disclosure was fair and reasonable. 750 ILCS 10/7(a)(2) (West 2016). Insofar as Greg is arguing that a presumption that a full and complete disclosure had been made as the result of the language in the premarital agreement, Greg has not developed this argument on appeal and has not provided any authority to support this contention, and therefore, the issue is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (arguments "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities"; points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing).

---

[5]In the trial court, Jennifer only referenced the "full and complete disclosure" language in arguing that she had not waived her right to a disclosure by acknowledged in the premarital agreement that both parties had made full and complete disclosures of their property. She did not, however, argue that the "full and complete disclosure" language in the premarital agreement required Greg to provide a "full and complete" disclosure rather than a "fair and reasonable" disclosure.

¶ 64    In turning to the issue of whether Greg's disclosure was "fair and reasonable," we note that the Illinois Premarital Agreement Act does not define a "fair and reasonable disclosure," the interpretation of which, as contemplated by the Illinois Premarital Agreement Act, is a matter of first impression in Illinois. See 750 ILCS 10/1 *et seq.* (West 2016). In interpreting the meaning of a "fair and reasonable disclosure of [a party's] property or financial obligations," we note that the term "financial obligations" is not defined in the Illinois Premarital Agreement Act but the term "property" is defined as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." 750 ILCS 10/2 (West 2016).

¶ 65    After reviewing the Illinois Premarital Agreement Act and cases from other states interpreting similarly adopted language from the UPAA, we conclude that the requirement of a fair and reasonable disclosure focuses on the information disclosed and not on the party to whom the disclosure was made. See, *e.g.*, *Friezo v. Friezo*, 914 A.2d 533, 545 (Conn. 2007) (the fair and reasonable disclosure requirement refers to the content of the disclosure—the nature, extent, and accuracy of the information—and not to extraneous factors such as the timing the disclosure or the receiving party's capacity to understand the disclosure). The duty is one of disclosure and not one of inquiry. *Id.* at 547 (citing *McHugh v. McHugh*, 436 A.2d 8, 11 (Conn. 1990)).

¶ 66    In determining whether Greg provided enough information to constitute a "fair and reasonable" disclosure, we note that the Illinois legislature did not adopt a "full" disclosure standard. See 750 ILCS 10/7(a) (West 2016). Thus, a "fair and reasonable" disclosure requires less than a complete disclosure, and the failure to disclose any particular piece of property or financial obligation is not, in and of itself, fatal to the enforcement of prenuptial agreement. Rather, the purpose of a disclosure is to ensure that each party has sufficient knowledge regarding the other party's financial circumstances in order to understand the nature of the legal rights being waived, with the burden to inform being on the disclosing party. See *Friezo*, 914 A.2d at 547-48; *Watson v. Watson*, 5 Ill. 2d 526, 532 (1955) (parties are required to disclose the nature and extent of their property so that the other party can intelligently choose whether to release his or her rights and interests to that party's property). Although a fair and reasonable disclosure need not be precise or exact, the requirement of a fair and reasonable disclosure requires each party to provide a "general approximation" of his or her income, assets, and liabilities. *Friezo*, 914 A.2d at 550. Whether a disclosure is "fair and reasonable" depends on the facts and circumstances of each case, including the information that was actually disclosed (in writing or otherwise), the information that was not disclosed, and the relative size of the nondisclosed information in relation to the parties' financial circumstances.

¶ 67    There is no requirement under the Illinois Premarital Agreement Act that a party's disclosure be in writing or that it be attached to the premarital agreement. See 750 ILCS 10/1 *et seq.* (West 2016). Although not required under the Illinois Premarital Agreement Act, generally, the most effective manner of satisfying the statutory obligation of disclosure, in most circumstances, is by appending a written schedule of information regarding the income and property interests of the parties at the time the agreement was executed to the parties' premarital agreement. See *Friezo*, 914 A.2d at 550.

¶ 68    In this case, under the Illinois Premarital Agreement Act, Greg and Jennifer were required to disclose to each other their property and financial obligations, including their interests in real or personal property and their income and earnings. See 750 ILCS 10/2, 7(a) (West 2016).

- 17 -

At what point prior to executing the agreement Jennifer received Greg's disclosure and whether Jennifer reviewed the disclosure before executing the premarital agreement are irrelevant factors in determining whether the information disclosed was "fair and reasonable." See, *e.g.*, *Friezo*, 914 A.2d at 551 (the amount of time available to review a prenuptial agreement is not relevant to determine whether a party made a fair and reasonable disclosure; the fair and reasonable disclosure requirement refers to the nature, extent, and accuracy of the information disclosed and not to extraneous factors such as the timing of the disclosure).

¶ 69    Additionally, the Illinois Premarital Agreement Act sets forth no state of mind standard in relation to providing a fair and reasonable disclosure. Greg argues that any omission in his disclosure was "inadvertent." The parties' premarital agreement indicated the property of the parties, as listed in their attached schedules, "together with any property which they have omitted inadvertently," and any after-acquired property was to be owned as separate, nonmarital property. This language pertains to the release of the parties' marital rights to the property of the other; it does not, and could not, excuse or waive the parties' statutory obligation to provide each other with a fair and reasonable disclosure. See 750 ILCS 10/7(a) (West 2016).

¶ 70    Furthermore, while Greg correctly argues that Jennifer cannot complain that she did not understand the premarital agreement or that she was misled by the terms of the premarital agreement where Jennifer never actually read the agreement (see *In re Marriage of Kloster*, 127 Ill. App. 3d 583 (1984)), his argument is irrelevant in determining whether his disclosure was fair and reasonable. Again, each party to a premarital agreement has a statutory obligation to disclose their property and financial obligations, which cannot be waived without an express waiver, in writing. See 750 ILCS 10/7(a)(2)(ii) (West 2016).

¶ 71    Even though each party had a statutory obligation to provide a fair and reasonable disclosure, it is Jennifer who, as the party seeking to avoid enforcement of the premarital agreement, had the burden of proving that Greg's disclosure was not fair and reasonable.[6] See 750 ILCS 10/7(a)(2)(i) (West 2016). Jennifer has failed to meet that burden.

¶ 72    In examining Greg's disclosure, we first note the written disclosure did not include Greg's earnings from managing Woodrum Automotive or the value of his cars and furniture. The nondisclosure of income, in some circumstances, could lead to a finding that a party's disclosure was not fair and reasonable. See, *e.g.*, *Olandi v. Olandi*, 34 A.3d 407, 413-14 (Conn. App. Ct. 2011) (husband's disclosure was not fair and reasonable because he did not disclose all the information necessary to accurately estimate the income he generated from certain real estate). However, on appeal, Jennifer has raised no issue regarding the nondisclosure of Greg's salary information or the value of his cars and furniture; presumably because she had lived with Greg for six years before executing the agreement and there is no dispute that the values

---

[6]This is a change from Illinois common law, under which the burden had been on the advantaged party to prove that a proper disclosure of his or her financial status had been made if the terms of the agreement were not fair. Where the parties were engaged to be married before the agreement was signed, a confidential relationship existed that imposed a duty of disclosure, and if the provisions made for the spouse receiving maintenance were largely disproportionate to the value of the other spouse's estate, a presumption arose of the intentional concealment of assets, and the burden shifted to the party claiming the validity of the agreement to prove the other party had full knowledge of his or her property. *In re Estate of Hopkins*, 166 Ill. App. 3d 652, 656 (1988) (citing *Debolt v. Blackburn*, 328 Ill. 420, 425 (1927), and *Yockey v. Marion*, 269 Ill. 342, 347-48 (1915)).

of those items had been sufficiently disclosed prior to the execution of the premarital agreement. Similarly, while Jennifer complains of Greg's failure to indicate the value of his home on his written disclosure, the evidence shows the value of home was disclosed by way of Jennifer living in the home for six years prior to the execution of the agreement so that she was undoubtedly familiar with the home and the surrounding area. As noted above, there is no requirement in the Illinois Premarital Agreement Act that a party's disclosure be in writing.

¶ 73    Additionally, Jennifer takes issue with Greg's failure to disclose his 20% ownership interests in Wayne Woodrum, Inc., and Woodrum Automotive. Jennifer testified that prior to the execution of the premarital agreement she had known that Greg had "some" ownership interest in Woodrum family business but did not know the extent of that ownership interest. As for the extent of Greg's ownership interest in the family business, Jennifer did not present any evidence as to whether she believed Greg owned more or less than a 20% interest. As for the value of Greg's ownership interest, Greg testified that his ownership interest was of no value to him. While there was evidence that Greg's ownership interest in Wayne Woodrum, Inc., sold for over $350,000 during the marriage, Greg testified that he received no money from that sale, he was only a partial owner of the Woodrum entities "on paper," and he received no income from his ownership interests in Woodrum entities. There was no contrary evidence showing the Woodrum automotive business was of any value or that Greg's ownership interest in the Woodrum business had any current or future value, whatsoever, at the time the premarital agreement was executed. We cannot speculate or assume that the Woodrum businesses were of any value without some evidence to support that determination.

¶ 74    Similarly, no evidence was presented regarding the value, if any, of Greg's interest in the farmland at the time the agreement was executed. Greg's written disclosure listed "Farm in Tallula and in Macomb." The evidence showed that Greg had a remainder interest in some of the farmland, subject to his father's life estate, but he received no income from that interest and received no income from the other farmland. There was no evidence of acreage or value for any of the farmland. Therefore, we do not know whether the nondisclosed information complained of by Jennifer pertains to less than an acre of farmland or hundreds of acres of farmland. We do not know, and cannot speculate as to, the value, if any, of Greg's ownership interest in farmland at issue.

¶ 75    Jennifer also presented no evidence regarding the value, if any, of Greg's Edward Jones investments at the time the premarital agreement was executed. While Jennifer argues that Greg's Edward Jones investments could have been worth "a dollar or one million dollars," Greg's financial affidavit submitted to the court for the purposes of awarding temporary maintenance showed that the investments were worth $28,000 and his individual retirement account (IRA) was worth $3000 in 2016, nine years after the execution of the premarital agreement. However, there was no evidence presented indicating that the Edward Jones investments and IRA were of any material value at the time the agreement was executed.

¶ 76    Jennifer also presented no evidence regarding the underlying value of Greg's assets/investments pertaining Maedco, Northwestern Mutual Life, and Illinois Dealers Life Insurance at the time agreement was executed. While Jennifer showed, by way of the parties' 2007 tax return, that those assets/investments generated approximately $10,000 of income in 2007, there was no evidence of the underlying value of those assets at the time the premarital agreement was executed. Moreover, there was no indication that Greg was even in possession of those assets/investments prior to the execution of the agreement in 2007; he could have

obtained those assets/investments from nonmarital property in 2007 but after the execution of the agreement. We also do not know when the $10,000 of income from those assets/investments was generated in 2007. Jennifer merely proving that Greg had failed to disclose assets of an unknown underlying value, which Greg may or may not have owned prior to the execution of the premarital agreement, that generated an additional $10,000 of income at some point in 2007, either before or after the execution of the premarital agreement, is not sufficient proof to support Jennifer's claim that Greg's disclosures were not fair or reasonable.

¶ 77    In sum, no issue was raised by Jennifer that Greg's salary or the value of his vehicles and furniture was not sufficiently disclosed. Greg's written disclosure further disclosed Greg's $150,000 pension, $120,000 of "cash on hand," and a $50,000 mortgage. The nondisclosure of the $10,000 of income earned at some point in 2007 from the Maedco, Northwestern Mutual Life, and Illinois Dealers Life Insurance assets, which Greg may have acquired after the premarital agreement was executed, does not support a finding that the Greg's disclosure was unfair or unreasonable in light of the disclosures that were made. We also cannot say that Greg's failure to provide values for his interests in the farmland, his interest in the Woodrum entities, or his Edward Jones investments supports a finding that his disclosure to Jennifer was not fair and reasonable where there was no evidence that those items were of any material value at the time the premarital agreement was executed in relation to the information that had been disclosed by Greg. Therefore, Jennifer has failed to meet her burden of proving that she was not provided with a fair and reasonable disclosure.

¶ 78                                    C. Adequate Knowledge

¶ 79    On appeal, Jennifer argues she did not have adequate knowledge of Greg's "assets," but only specifically claims a lack of adequate knowledge of Greg's investments, retirement accounts, and ownership interest in the Woodrum businesses. Jennifer provides no specific argument, on appeal, regarding any alleged lack of adequate knowledge of Greg's interests in the farmland, his vehicles, his residence, or his income.

¶ 80    Here, the record shows that Jennifer had "adequate knowledge" of Greg's property and financial obligations at the time the premarital agreement was executed where she had lived with him for six years prior to signing the agreement, was familiar with his lifestyle, and had been provided a written financial disclosure. We initially note that Greg's written disclosure showed his pension was valued at $150,000, and Jennifer's claim that she did not have adequate knowledge of the pension is meritless. Jennifer lived with Greg for six years and was provided a written disclosure of Greg's property and financial obligations so that Jennifer had, or reasonably could have had, adequate knowledge of Greg's salary; Greg's mortgage; and the values of Greg's home,[7] vehicles, household goods, furniture, and pension, which was all of Greg's "property and financial obligations" that the evidence showed was of any material value at the time the agreement was executed.

¶ 81    While Jennifer argues that she did not have adequate knowledge at the time the premarital agreement was executed of the value of Greg's ownership interests in the Woodrum businesses

---

[7]Jennifer should have known the approximate value of Greg's home after having lived in it for six year prior to the execution of the premarital agreement, so that value of the home was not only reasonably disclosed by Greg in relation to section 7(a)(2)(i) (discussed *supra* ¶ 72) but also so that Jennifer had adequate knowledge of the home's value in relation to section 7(a)(2)(ii).

or the value of Greg's investments/IRA accounts, she presented no evidence regarding the value of those assets. Without knowing the value of those assets, if any, this court is unable to determine the relevancy the undisclosed information. In Jennifer's own words, the assets could have been worth "a dollar or one million dollars."

¶ 82    As discussed above, the failure to disclose any particular piece of property or financial obligation is not, in and of itself, fatal to the enforcement of a prenuptial agreement. Similarly, "adequate knowledge" does not require full knowledge of every asset or financial obligation that is owned or owed by a party. Rather, "adequate knowledge" is knowledge that a party has, or reasonably could have had, regarding the general approximation of the other party's income, assets, and liabilities. Jennifer failed to meet her burden of proving that she did not have, or reasonably could not have had, an adequate knowledge Greg's property or financial obligations where she failed to show that any of Greg's nondisclosed asset were of any material value at the time the premarital agreement was executed.

¶ 83                                    D. Unconscionable

¶ 84    Under the Illinois Premarital Agreement Act, it appears we need not address Jennifer's claim that the agreement was unconscionable because the premarital agreement is enforceable where Jennifer failed to meet her burden of proving that Greg's disclosure was not fair and reasonable or that she did not have adequate knowledge of Greg's property. See 750 ILCS 10/7(a)(2) (West 2016) (a premarital agreement is not enforceable if the agreement was "unconscionable" when it was executed *and* before execution of the agreement the party against whom enforcement is sought proves he or she was not provided a fair and reasonable disclosure or the other party's property or financial obligations, did not waive any right to disclosure in writing, and did not, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party). However, alternatively, since Jennifer has argued and alleged the premarital agreement was unconscionable at the time of execution and thus unenforceable, we address the issue of unconscionability as contemplated by the Illinois Premarital Agreement Act.

¶ 85    The Illinois Premarital Agreement Act does not define the term "unconscionable." See 750 ILCS 10/1 *et seq.* (West 2016). Under the Illinois Premarital Agreement Act, unconscionability is determined at time the agreement is executed—not at the time the agreement is enforced.[8] See 750 ILCS 10/7(a)(2) (West 2016). In Illinois, a contract may be unenforceable if it is procedurally unconscionable, substantively unconscionable, or some combination of the two. *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 21 (2006) (citing *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99 (2006)). The issues of unconscionability should be examined with reference to all of the circumstances surrounding the transaction. *Id.* at 24.

¶ 86    Whether a contract or a portion of a contract is unconscionable is a question of law for the court to decide and is reviewed *de novo*. 750 ILCS 10/7(c) (West 2016) ("[a]n issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law").

---

[8] The comments to the UPAA provide that in determining whether an agreement was unconscionable, " 'the court may look to the economic circumstances of the parties resulting from the agreement, and other relevant evidence such as the conditions under which the agreement was made, including the knowledge of the other party.' " Unif. Premarital Agreement Act § 6 cmt. (Unif. Law Comm'n 1983) (quoting Unif. Marriage and Divorce Act § 306 cmt. (Unif. Law Comm'n 1973)).

However, to the extent that the circuit court made findings of fact in the analysis of unconscionability, those factual findings are reviewed under the manifest weight of the evidence standard. See *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 777 (2007).

¶ 87                                    i. Procedurally Unconscionable

¶ 88        Jennifer argues the premarital agreement was procedurally unconscionable because she did not know that she was represented by Weston, Greg selected Weston to be her attorney, the Woodrum family business paid Weston's bill, and Weston did not have Greg's written disclosure when he met with Jennifer. Greg initially argues that by signing the agreement without reading it, Jennifer has waived any objections to the agreement, including her claim that she did not know that Weston was her attorney. Greg additionally argues that the premarital agreement was not procedurally unconscionable where Jennifer first met with Weston three months prior to the execution of the agreement and Weston reviewed the agreement with her at least twice, specifically discussing the waiver of maintenance and release of marital rights under the agreement.

¶ 89        Procedural unconscionability is some impropriety during the process of forming the contract depriving a party of a meaningful choice. *Kinkel*, 223 Ill. 2d at 23 (citing with approval *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989-90 (1980)). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it," taking into consideration the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability. *Razor*, 222 Ill. 2d at 100 (citing with approval *Frank's Maintenance*, 86 Ill. App. 3d at 989). Factors to be considered in determining whether an agreement is procedurally unconscionable include all of the circumstances surrounding the transaction, the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print. *Id.*

¶ 90        Here, all of the circumstances surrounding the execution of the premarital agreement show that the parties had both previously been divorced twice and had children from their prior relationships. In discussing getting married, Greg clearly indicated to Jennifer that he would not get married again unless there was a premarital agreement in place. Jennifer had been licensed to sell insurance in 1987 and was able to explain and sell insurance policies that could be complicated, so that she was not incapable of understanding the terms of the contract. The premarital agreement was drafted by Greg's attorney, who advised that Jennifer be represented by her own attorney. Greg testified that Weston had been hired to represent Jennifer because he was a client of Woodrum Automotive and had a good reputation as an attorney. Jennifer met with Weston twice and had months to review the premarital agreement before finally executing it before a notary on June 13, 2007. In the premarital agreement, Jennifer and Greg acknowledged that they were each represented by counsel, with Weston representing Jennifer and Tucker representing Greg; they were each able to support themselves; and they were each waiving their marital rights to the other's property and to any maintenance.

¶ 91        We agree with Greg that Jennifer cannot claim a lack of understanding of the agreement or that the agreement misled her where she did not read the agreement. See *Kloster*, 127 Ill. App. 3d at 585 (one who had the opportunity to read a contract before signing and signs before reading it cannot later plead a lack of understanding or that the contract misled him). "[T]here

is generally little that courts can do to protect persons who are prone to signing contracts without reading them from the natural consequence of their folly, the law being that a party who is afforded an opportunity to read a contract prior to signing but signs the contract without reading it, cannot be heard to say that he was deceived as to its contents." *Hintz v. Lazarus*, 58 Ill. App. 3d 64, 66 (1978). Here, the agreement clearly indicates that Jennifer was being represented by Weston, and therefore, she cannot claim a lack of understanding in relation to Weston's representation. She also cannot claim that she did not understand that she would be receiving no property or maintenance from Greg. Before the agreement was executed, Jennifer had already decreased her work efforts in regard to her insurance sales but, nonetheless, executed the premarital agreement indicating that she was able to be self-supporting in the event of a dissolution of the parties marriage and that she was waiving her marital property rights and any right to receive maintenance.

¶ 92    Even if Jennifer did not know Weston was representing her, she had time before executing the agreement to seek out legal advice from an attorney of her choosing, which she did not do. We acknowledge that Weston did not have Greg's written disclosure when reviewing the premarital agreement with Jennifer. However, Jennifer had a reasonable opportunity to seek out Weston's counsel, or the counsel of another attorney, upon subsequently receiving the disclosure. Thereafter, even after executing the agreement on June 13, 2007, Jennifer had over two weeks prior to the wedding to review the agreement and seek legal advice or modification of the terms, which she did not do, before marrying Greg. See 750 ILCS 10/5 (West 2016) (a premarital agreement becomes effective upon marriage). Jennifer was free to choose to remain single rather than sign the agreement. See *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 519 (2001) (there is nothing legally or morally wrong with a party conditioning marriage upon the execution of a premarital agreement). Despite having a reasonable opportunity to review and understand the terms of the premarital agreement and to review Greg's disclosure, Jennifer chose to sign the agreement and marry Greg, knowing that the intent of the agreement was for the parties to waive their marital rights to each other's property and to waive maintenance. Given the evidence presented, Jennifer has failed to meet her burden of proving the premarital agreement was procedurally unconscionable.

¶ 93                                    ii. Substantive Unconscionability

¶ 94    Jennifer additionally argues that the premarital agreement was substantively unconscionable where the agreement made no provisions for her by way of property or support, even though she was already substantially financially dependent on Greg at the time she executed the premarital agreement. In support of her argument, Jennifer indicates that at the time the agreement was executed she was 53 years old; she only earned $7634 that year (in 2007); she was financially dependent upon Greg; Greg paid the bills; she only had a high school education; she had been out of the workforce for several years; she did not own real property; her car was jointly owned with Greg; her investments and savings were worth less than $55,000; Greg was 50 years old; Greg earned $55,000 that year (in 2007); Greg had a 20% interest in two companies, one of which sold in 2014 for more than $350,000; Greg owned a home that was valued at $230,000 on his 2016 financial affidavit; and Greg had $120,000 cash on hand, interests in two farms, investments with Edward Jones, vintage cars, an ownership interest in a car he shared with Jennifer, and other financial interests that were indicated in the parties' 2007 joint tax return. Greg argues the premarital agreement was not substantively

unconscionable because each party had waived maintenance from the other and each party would leave the marriage with the property they entered into the marriage with and with any after-acquired property.

¶ 95   Substantive unconscionability refers to terms that are "inordinately one-sided in one party's favor." *Razor*, 222 Ill. 2d at 100. Substantive unconscionability is based on the actual terms of the contract in regard to the relative fairness of the obligations assumed and is concern with whether the terms are harsh, oppressive, or so inordinately one-sided as to oppress or unfairly surprise an innocent party and whether there is an overall imbalance in the obligations and rights imposed by the bargain. *Kinkel*, 223 Ill. 2d at 28.

¶ 96   In this case, the terms of the premarital agreement were not so harsh, oppressive, or inordinately one-sided to be substantively unconscionable where both parties acknowledged they had the ability to be self-supporting and both released any claims to each others' premarital and after-acquired property and to any maintenance. The Illinois Premarital Agreement Act authorizes parties to contract in regard to, among other things, the disposition of their property upon dissolution and in regard to the elimination of maintenance (spousal support) and looks to whether the agreement was unconscionable at the time of execution, not at the time of the dissolution.[9] See 750 ILCS 10/7(a)(2) (West 2016) (providing that a premarital agreement is not enforceable if the agreement was "unconscionable when it was executed"). The agreement and the evidence indicated that Jennifer was able to support herself at the time she voluntarily executed the agreement, although she chose not to do so during the marriage, even in light of the terms of the agreement indicating that she would receive no property or maintenance from Greg in the event of dissolution of the marriage. The fact that after Jennifer voluntarily executed the premarital agreement she chose to continue to rely on Greg for financial support throughout the marriage does not support a finding that the terms of agreement were substantively unconscionable at the time the agreement was executed. See *Landes v. Landes*, 268 Ill. 11, 20 (1915) (premarital contracts would have to be dispensed with if they were held invalid solely because the wife does not receive as much as she would if there was no contract).

¶ 97   We note that the Illinois Premarital Agreement Act provides an exception to enforcing the terms of a premarital agreement that eliminates spousal support where not receiving spousal support (maintenance) would cause "undue hardship in light of circumstances not reasonably foreseeable at the time of the execution of the agreement." 750 ILCS 10/7(b) (West 2016). However, Jennifer did not prove such an undue hardship claim in the trial court or make an undue hardship argument on appeal.

¶ 98   We, therefore, conclude that the trial court did not err in finding that the premarital agreement was valid and enforceable.

---

[9]Under Illinois common law, maintenance waivers were disfavored and would only be enforced if given in exchange for significant financial consideration. *In re Marriage of Martin*, 223 Ill. App. 3d 855, 857 (1992). Courts also looked to the parties' circumstances at the time of the dissolution to consider whether an unforeseen circumstance not contemplated by the parties, beyond a mere change in economic fortune, had occurred in order to mitigate the potential harm to spouses that could result from the strict enforcement of a maintenance provision. *In re Marriage of Burgess*, 138 Ill. App. 3d 13, 15 (1985).

II. Issue of Property

¶ 100 Jennifer also argues that the trial court prematurely entered the final dissolution judgment without properly addressing "the issue of property." Jennifer contends that the trial court did not make a property award or specific findings as to the classification of assets as marital or nonmarital or other factual findings regarding the parties' property. Jennifer claims that she had not completed discovery and was, therefore, unable to present evidence regarding "classification of the parties' property and the proper application of the prenuptial agreement, such as contribution or reimbursement." She notes that there was "no evidence as to the car the parties jointly owned back in 2007 or the checking account they had" and there was no evidence as to what funds Greg may have used to acquire or improve "assets" during the marriage. Jennifer requests for this court to reverse the trial court's entry of the judgment of dissolution and remand this case for further discovery and further proceedings in regard to the division of property. Greg argues that the language of the premarital agreement provides that any property acquired by either party was nonmarital property so that there were no outstanding property issues in need of resolution.

¶ 101 Section 401(b) of the Illinois Marriage and Dissolution of Marriage Act provides that a dissolution judgment shall not be entered unless the court has considered, approved, reserved, or made provision for, *inter alia*, "the disposition of property." 750 ILCS 5/401(b) (West 2016). In order to distribute property upon the dissolution of marriage, the trial court must first classify the property as either marital or nonmarital property. *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 861 (1998). We apply a manifest weight of the evidence standard to a trial court's finding that there was no marital property to divide. See *In re Marriage of Berger*, 357 Ill. App. 3d 651, 659-60 (2005). A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, and not based on the evidence. *Id.* at 660. While a trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence (*id.* at 659-60), its final division of marital property will not be disturbed unless the trial court clearly abused its discretion (*In re Marriage of Crook*, 211 Ill. 2d 437, 452 (2004)).

¶ 102 In this case, in its written dissolution judgment, the trial court found that there was no marital property to divide because all the parties' property was nonmarital property. Therefore, Jennifer's contention that the trial court failed to make specific findings as to the classification of assets as marital or nonmarital or other factual findings regarding the parties' property is without merit.

¶ 103 Also, Jennifer's argument that "there [was] no evidence as to what funds Greg may have used to acquire or improve assets during the marriage" is entirely meritless. The evidence showed that Greg had funds from his nonmarital property prior to the marriage (*i.e.*, $120,000 cash on hand) and from his salary throughout the marriage (which was nonmarital property under the premarital agreement), which he may have used to acquire or improve assets during the marriage.

¶ 104 In reviewing the trial court's finding that all the parties' property was nonmarital, we note that the evidence showed that Greg and Jennifer kept their assets separate (with the exception of a joint bank account and automobile they owned jointly prior to the marriage). All of the property Greg and Jennifer acquired after their marriage was nonmarital property that had been excluded from becoming marital property by the parties' prenuptial agreement. See 750 ILCS 5/503(a)(4) (West 2016) (nonmarital property includes "property excluded by valid agreement

of the parties, including a premarital agreement"). When asked by the trial court prior to the entry of the dissolution judgment, and by this court during oral arguments, what property still needed to be addressed, Jennifer's counsel only indicated that there had been jointly owned property (the joint bank account and 2002 Ford Mustang GT) prior to the parties' marriage in 2007. However, there is no evidence that either the parties' joint bank account (the status of which Jennifer could have presumably sought information about directly from the bank as a joint owner) or the parties' 2002 Mustang still existed at the time the dissolution judgment was entered on May 30, 2017. In fact, Greg's financial affidavit submitted in 2016 did not list either of those assets, which supports a finding that those assets no longer existed. Therefore, based on the evidence presented, the trial court addressed all of the parties' property at issue. The trial court's classification of all the property at issue as nonmarital property was not against the manifest weight of the evidence.

¶ 105     Even if Jennifer was correct that the initial discovery in this case had been limited to issues of temporary maintenance and the validity of the premarital agreement, those issues were related to the Greg's financial circumstances (his financial circumstances prior to the marriage in regard to whether his disclosure was fair and reasonable and whether Jennifer had adequate knowledge of his financial circumstances before executing the prenuptial agreement and his financial circumstances at the time of the dissolution proceedings in regard to the issue of temporary maintenance). As the trial court noted, Jennifer had taken depositions but failed to raise any issue in regard to any alleged marital property. During the proceedings, Jennifer never argued that any specific asset was marital property or that she had contributed to any specific assets for which she was entitled reimbursement. Furthermore, Jennifer did not make any additional discovery requests after the trial court had found the parties' premarital agreement was valid or in response to Greg's motion for the entry of a dissolution judgment. Jennifer has not pointed to any specific discovery request that she was prevented from pursuing or to any specific asset that remained at issue. Consequently, Jennifer's contention that the trial court entered the dissolution judgment prematurely has no merit.

¶ 106                                    III. Temporary Maintenance

¶ 107     On cross-appeal, Greg argues that neither party had the right to receive temporary maintenance where, under the premarital agreement, both parties had acknowledged that they were each "self-supporting" and that they each had educational and work experience that had allowed them to acquire valuable and readily marketable employment skills and their own separate assets to be able to provide for their own support. Greg contends that in construing the premarital agreement, it is clear that the parties had intended for each party to support himself or herself and for neither party to receive maintenance of any kind from the other. Jennifer did not respond to Greg's cross appeal. Nonetheless, we decide this issue without the aid of a cross-appellee's brief pursuant to *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (where the appellee fails to file a brief but the record is simple and the claimed errors are such the court can easily decide them without the aid of an appellee's brief, the court of review should decide the merits of the appeal). *People v. Johnson*, 197 Ill. 2d 478, 481 (2001).

¶ 108     Here, the issue is whether temporary maintenance was barred by the terms of the parties' prenuptial agreement. A premarital agreement is a contract and, therefore, the rules governing contract interpretation are applicable. *In re Marriage of Best*, 387 Ill. App. 3d 948, 949 (2009).

The construction of a contract presents a question of law, which we review *de novo*. *Id.* The primary purpose of construing a contract is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). A court must look to the language of the contract, given its plain and ordinary meaning, as the best indication of the parties' intent. *Id.* at 233. Because words derive their meaning from their context, a contract must be construed as a whole, viewing each part in light of the others. *Id.* The intent of the parties is not determined from detached portions of a contract or any clause or provision standing by itself. *Id.* If the terms of a contract are susceptible to more than one meaning, it is ambiguous. *Id.* In that case, a court may consider extrinsic evidence to determine the parties' intent. *Id.*

¶ 109    In this case, the recitals to the parties' premarital agreement indicated it was the intent of the parties to define their respective rights in the property of the other, "both during the marriage relationship and after its termination"; to avoid interests that each might acquire in the property of the other; and to pass their respective property to their designated beneficiaries. In the recitals, the parties acknowledged that while they both "fully intend[ed] to commit themselves to achieving a successful long-term marriage and intend[ed] and desir[ed] to provide fairly and reasonably for the support of each other," they were personally aware of the practicalities and realities of life and the time, financial, emotional costs in the unfortunate event of "a legal proceeding concerning the parties' separation or dissolution," and they intended to minimize the time, financial, and emotional costs involved in the event of a future "separation or dissolution of marriage" by entering into the premarital agreement. Recitals to a contract provide explanations of the circumstances surrounding the execution of the contract but are not generally binding on the parties and are not an effective part of their agreement unless referred to in the operative portion of the agreement. *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 45 (2003).

¶ 110    Under the operative terms of the agreement, the parties referred to (1) property division, "if any there be," upon "divorce or dissolution of marriage"; (2) awarding of jointly owned property upon "divorce or dissolution of marriage" in proportion to their contributions to acquiring such property from their separate funds; and (3) crediting or refunding either parties' investment or contribution toward property of the other "in the event of a divorce." The operative terms of the agreement, in the maintenance section (section 8), the agreement provided, in relevant part, "Husband and Wife, therefore, hereby waive from the other all right to maintenance for themselves from the other under the laws of the State of Illinois or any other state in which either party may hereafter reside *upon divorce or dissolution of marriage contemplated by this Agreement*." (Emphasis added.) The following section (section 9), titled "Dissolution of Marriage or Separation," indicated the parties intended for the agreement to be binding "in the event of a dissolution of marriage or a separation by and between the parties."

¶ 111    As mentioned above, in the recital section, the parties indicated their intent for entering into the premarital agreement was based upon on their awareness of, and their intent to minimize, the time and financial and emotional costs involved in the event of "*a legal proceeding concerning the parties' separation or dissolution*." (Emphasis added.) Under the parties' agreement, the requirement of a legal proceeding qualifies the word "separation," thereby restricting the type of separation covered by the agreement to a legal proceeding and demonstrating the parties' intent to place a narrow construction on the word "separation." See *Best*, 228 Ill. 2d at 120-21 (holding the word "separate" in the parties' premarital agreement, wherein the parties' waived spousal support in the event they "separate" or their marriage was

dissolved, was intended by the parties' to require a legal separation (not a mere physical separation) where their agreement reflected their "awareness of the practical, financial, and emotional considerations present 'in the unfortunate event of a *legal proceeding concerning the parties' separation* or dissolution' " (emphasis in original)). Therefore, the maintenance provision of section 8, under which the parties waived maintenance, was not effective until dissolution of the parties' marriage or at the time of a legal separation. Consequently, the trial court did not err in awarding temporary maintenance during the pendency of this case, prior to the entry of the dissolution judgment.

¶ 112                                    CONCLUSION

¶ 113       For the foregoing reasons, the judgment of the circuit court of McDonough County is affirmed.

¶ 114       Affirmed.