2020 IL App (1st) 191817-U

FIRST DISTRICT
SECOND DIVISION
May 19, 2020

No. 1-19-1817

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* the Marriage of: | ) | Appeal from the |
| | ) | Circuit Court of |
| IRMANA SARANCIC, | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | No. 2014 D 10299 |
| | ) | |
| and | ) | Honorable |
| | ) | Debora B. Walker, |
| ELDAR SARANCIC, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*: The parties' premarital agreement was unenforceable. The trial court did not err in awarding maintenance, ordering a Rule 215(a) evaluation, imposing Rule 219(c) sanctions, and distributing the marital estate.

¶ 2     After more than seven years of marriage, petitioner Irmana Sarancic filed a petition for dissolution of marriage from respondent Eldar Sarancic. The parties disputed the validity of the "Prenuptial Agreement" (Agreement) they executed two days before their marriage. The trial court found the Agreement "oppressive, one-sided, unconscionable, and unenforceable." Eldar appeals, seeking enforcement of the Agreement. In the alternative, Eldar claims that the trial court erred in:

(1) awarding and calculating maintenance, (2) ordering an Illinois Supreme Court Rule 215(a) (eff. March 28, 2011) evaluation, (3) imposing Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) sanctions, and (4) failing to distribute the marital estate in "just proportion." Finding no error, we affirm the trial court's judgment in its entirety.

¶ 3                                    BACKGROUND

¶ 4         Eldar and Irmana were married on June 24, 2007, and they had three children during their marriage.

¶ 5         On June 22, 2007, two days before the parties were married, they executed the Agreement.[1] Under the Agreement, Irmana would receive a lump sum payment of $30,000 if they remained married for more than five years. The lump sum payment was in lieu of maintenance and "any and all rights of [Irmana] to the equitable distribution of any other assets." Eldar's "sole property" included: (1) 918 E. Old Willow Road, Unit 201, Prospect Heights, IL 60070; (2) 1305 S. Michigan Avenue, 1308, Chicago, IL 60605; (3) 169 Columbia, Des Plaines, IL 60016; and (4) taxicab medallion number 4914. Under the "Full Disclosure" provision, Eldar's net worth was listed as between $750,000 and $1 million, and his annual income was approximately $90,000. Irmana's net worth was $0 and her annual income was approximately $0. The "Full Disclosure" provision also stated that "Each party represents that his or her Financial Statement annexed hereto as Schedules A-1 and A-2 are accurate and complete." Under the "Legal Representation" section, Martha A. Bozic was listed as Eldar's legal counsel and no attorney was listed as Irmana's legal counsel.

¶ 6         On November 12, 2014, Irmana filed a petition for dissolution of marriage. Eldar filed a motion to declare the Agreement enforceable and Irmana moved to declare the Agreement

---

[1]The Agreement was not dated, but the parties do not dispute that it was executed on June 22, 2007.

unenforceable. The following testimony was adduced during the hearing on the parties' cross-motions for a declaratory judgment regarding the Agreement's validity.

¶ 7        Irmana testified that she was born in Bosnia and moved to the United States at the end of October of 2006, when she was hired as an au pair for a family in Ohio. Her highest level of education was high school in Bosnia. When she moved to the United States, Irmana had a basic understanding of English, no more than a 3 on a scale of 10. In February of 2007, Irmana relocated to Chicago to work as an au pair for a different family.

¶ 8        Irmana met Eldar in April of 2006 in Bosnia and they started officially dating when she moved to Chicago in February of 2007. In May of 2007, they got engaged and Irmana was no longer working. Irmana was 19 years old and Eldar was 36.

¶ 9        Eldar first approached Irmana about signing a prenuptial agreement in June of 2007 and told her "if we want to get married, I need to sign the prenup and how everyone in America does it and we also need to do it." Two days before their wedding, they met with Eldar's attorney, Bozic. Both English and Bosnian were spoken during the meeting. Irmana did not understand what was going on. Bozic stated that "whatever we make during the marriage, in case of the divorce, we going to split up; whatever we own prior to marriage, we will keep it for ourselves." Irmana could not read or understand the Agreement "because my English was not good" and she had no idea what it said. Irmana did not have an attorney in the room representing her. After Bozic finished typing on the computer, "we both signed, Eldar and I."

¶ 10        After they both signed the Agreement, Eldar took Irmana in the hall and told her that she was "going to meet with Dragan Milosevic" and "that he was going to be my attorney." Milosevic's office was down the hall. Irmana never met or talked to Milosevic before that day. Milosevic told her the same thing, "how whatever we make during the marriage, me and Eldar, in case of the divorce, it's going to be split[ ] up. But whatever we had prior to married is going to be

– is going to stay ours." Irmana and Milosevic did not discuss the $30,000 payout or waiver of maintenance. The meeting with Milosevic lasted about 10 to 15 minutes. She did not pay Milosevic.

¶ 11     During the marriage, Irmana worked at Target for about six or seven hours a week, usually on Sundays. She wanted to work more hours, but Eldar "never allowed me because he didn't want to have anyone else to baby-sit our kids other than me." Irmana gave her paychecks to Eldar, and she did not know what he did with them. In 2013, she and Eldar opened a joint bank account. She never saw the bank statements, because Eldar never allowed her to open any of the mail that was delivered to the house.

¶ 12     Irmana first learned about the Agreement's terms in 2014, when she decided to divorce Eldar and her divorce attorney explained the terms to her. At that time, her understanding of English was much higher, an 8 or 9 on a scale of 10. On cross-examination, Irmana testified that she knew Eldar had a premarital agreement in his previous marriage and acknowledged that her sister had also signed a premarital agreement.

¶ 13     When she met with Milosevic, he had an unsigned copy of the Agreement and she brought her copy of the signed Agreement with her. Milosevic did not go through the Agreement with her, show her the contents, or translate it from English to Bosnian. Irmana never looked at the Agreement or skimmed through its pages. At the time, she did not know she was signing a legal document and "was listening to Eldar and just following his direction."

¶ 14     Bozic testified that she represented Eldar on his uncontested divorce from his first wife. She went over the Agreement in person with Eldar twice, and Irmana was present the first time. During the meeting with Eldar and Irmana, Bozic conducted an "intake," obtaining financial information from Eldar and Irmana. Bosnian was spoken the whole time, because that was Irmana's native language.

¶ 15	When Bozic discovered that Irmana was not represented by counsel, she "suggested that she get represented." Bozic gave Irmana a list of four or five attorneys who spoke Bosnian. After Bozic learned that "they were hiring" Milosevic, she sent him a draft of the Agreement.

¶ 16	Bozic stated that Eldar's net worth included "every single thing that he had." His net worth ranged between $750,000 and $1 million based on the fair market value of the properties that he owned.

¶ 17	On June 22, 2007, Irmana, Eldar, Milosevic, and Bozic all met in Bozic's office, and they chatted in Bosnian.Milosevic and Irmana then went over the Agreement in a separate conference room. According to Bozic, the Agreement was not signed before Irmana and Milosevic met separately. Eldar and Bozic reviewed the Agreement, but they were not in the same conference room as Irmana and Milosevic.

¶ 18	After each party finished reviewing the Agreement, "then we kind of went over it just like, okay, everybody understands, is satisfied. And then we signed all in the presence of each other." Irmana did not have any questions when she signed the Agreement or after.

¶ 19	According to Bozic, even though the Agreement referenced financial statements attached as Schedules A-1 and A-2, no schedules were attached to the Agreement because Eldar's assets were reflected on the tax return and everything else was disclosed within the body of the Agreement. Eldar's financial records "were passed to the other side" and his tax returns were included as an attachment to the Agreement at the time it was signed.

¶ 20	Eldar testified that he was born in Bosnia and lived there for 24 years. In August of 1994, he moved to the United States. Eldar received a mechanical engineering degree in Bosnia and in the United States.

¶ 21       Eldar talked to Irmana about a premarital agreement "pretty much all the time." He told Irmana what he expected to have in the agreement, about his properties and his salary, and "was very thorough in explaining my financial abilities, my job."

¶ 22       After Eldar proposed to Irmana, he contacted Bozic about drafting a premarital agreement. Irmana and Eldar met with Bozic and they were given a draft, but not the final version, of the Agreement. During that meeting, they spoke Bosnian because Irmana "barely spoke English." He did not see the list of attorneys and did not contact any of the attorneys personally, because "it [was] Irmana's choice." Irmana told Eldar how much it cost to retain Milosevic, but Eldar claims that he did not personally pay him.

¶ 23       The first draft of the Agreement was later modified to increase the payout amount in the event of a divorce after five years of marriage from $20,000 to $30,000. Bozic told Eldar "that the other side requested a higher amount, so [he] accepted." The final agreement was not signed until two weeks after the first meeting. Eldar and Irmana both received a copy of the Agreement after it was signed, which contained no attachments.

¶ 24       Two years after she signed the Agreement, Irmana started working at Target. Eldar wanted her to work full-time, because he thought that "it [was] better for healthier family that they both have full-time jobs." Everything that Eldar purchased during the marriage was put in his sole name, and the "vast majority" of his earnings were deposited into his individual bank account. He occasionally transferred money into the joint account to pay for the children's expenses, but Irmana "had full access to the account and could use it for anything."

¶ 25       On September 14, 2016, the trial court ruled that the Agreement was "oppressive, one-sided, unconscionable, and unenforceable." Eldar appealed that ruling, but this court dismissed his appeal, finding the order to be interlocutory.

¶ 26    Discovery and litigation relating to the divorce proceedings spanned for more than four years. During that time, the trial court entered various orders, including an order requiring Eldar to pay Irmana $2,710 per month as temporary maintenance.

¶ 27    Many custody issues also arose during the pendency of this case. During the proceedings, Irmana filed a "Motion for Mental Examination Pursuant to Supreme Court Rule 215(a)," alleging that Eldar engaged in "a course of conduct intended to alienate the minor children" from her. Eldar initiated multiple Department of Children and Family Services investigations against Irmana, which were all determined to be unfounded. The trial court had previously restricted Eldar's parenting time with the children to supervised visits. The trial court denied Irmana's motion for a Rule 215(a) evaluation.

¶ 28    On September 15, 2018, Carol Reid, Psy. D., clinical director at Associates in Human Development Counseling, LLC, cancelled Eldar's visit with his children "in response to ongoing concerns regarding [Eldar's] interactions with his children. *** At this time, we are concerned about the negative impact his behaviors are having on the children."

¶ 29    The trial on the dissolution of marriage was scheduled for September 24, 2018 through September 28, 2018. During the protracted litigation, Eldar routinely failed to respond to and comply with discovery requests. On September 18, 2018, Eldar produced supplemental discovery that consisted of 17 documents. The supplemental discovery included a loan of $11,261 against his Caterpillar 401(k) Retirement Plan obtained on September 17, 2018, one day before the production of his supplemental discovery, and two promissory notes, also dated September 17, 2018, in the amount of $16,623 and $149,880, totaling $166,583, for loans he obtained from family members. Eldar asserted that the loans were necessary to pay for attorney fees.

¶ 30    On September 21, 2018, Irmana filed a motion pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) to bar Eldar from presenting evidence and defenses relating to the

supplemental discovery, arguing an inadequate amount of time to prepare a trial strategy or any dissipation claims. The trial court granted Irmana's motion and also temporarily suspended Eldar's parenting time until entry of the dissolution of marriage judgment.

¶ 31    During the marriage dissolution trial, the parties testified regarding their current employment, income, assets, and expenses. Irmana continued working at Target and asked for additional hours on the days that she did not have the children. At the time, Irmana earned $12 an hour and as of the end of August of 2018, she had earned $3,303 in wages from working at Target. Eldar argued that income equivalent to $16 an hour for 40 hours a week should be imputed to Irmana because she "failed to seek better pay and more employment."

¶ 32    On December 19, 2018, the trial court entered a judgment for dissolution of marriage. As relevant here, the trial court: (1) awarded Irmana the property located at 1305 S. Michigan Avenue along with the two garage spaces and the Sarajevo Taxi Company, including a medallion and MV1 automobile; (2) found "that allowing Eldar to exercise unsupervised parenting time would endanger seriously the children's mental, moral, and emotional health;" (3) awarded Irmana $2,903 per month as statutory guideline maintenance for a period of 28 months commencing on December 31, 2018; (4) declined to allocate Eldar's payment of temporary maintenance as a credit to the duration of maintenance; (5) awarded Eldar $166,513 that he received as a predistribution from the marital estate; (6) awarded Eldar the 2007 Chevrolet Impala; and (7) ordered Eldar to submit to a Rule 215(a) mental evaluation "to be conducted by a professional specializing in parental alienation, who is to be selected by the GAL, and paid by Eldar." The trial court denied Eldar's posttrial motions.

¶ 33                                ANALYSIS

¶ 34                        A. Enforceability of the Agreement

¶ 35        Eldar argues that the trial court erred in finding the Agreement to be "oppressive, one-sided, unconscionable, and unenforceable."

¶ 36        The Illinois Uniform Premarital Agreement Act (Act) (750 ILCS 10/1 *et seq.* (West 2018)), which governs all premarital agreements executed on or after January 1, 1990 (750 ILCS 10/11 (West 2018)), addresses the enforceability of premarital agreements. Section 7(a) of the Act states:

> "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
>> (1) that party did not execute the agreement voluntarily; or
>>
>> (2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:
>>
>>> (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>>>
>>> (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>>>
>>> (iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."
>>>
>>> 750 ILCS 10/7(a) (West 2018).

At issue here is whether the Agreement was unconscionable. Thus, under the Act, Irmana bears the burden of proving "that the agreement was unconscionable when it was executed," *and* the existence of each of the circumstances listed in subsections (a)(2)(i), (ii), and (iii) "before execution of the agreement." 750 ILCS 10/7(a)(2) (West 2018); *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 38; see *Woodrum*, 2018 IL App (3d) 170369, ¶ 85 (party seeking to declare a premarital agreement unenforceable bears the burden of establishing the grounds specified in

section 7(a) of the Act). The relevant time period is when the agreement was executed, not when a party seeks to enforce it. *Id.*

¶ 37    Turning first to the issue of unconscionability, an agreement may be either procedurally or substantively unconscionable, or a combination of both. *Kinkel*, 223 Ill. 2d at 21. Procedural unconscionability concerns the process of how the agreement was formed and substantive unconscionability concerns the agreement's actual terms. *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60 (2011); *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d 761, 775-76 (2007). Procedural unconscionability considerations include: "all of the circumstances surrounding the transaction, the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Woodrum*, 2018 IL App (3d) 170369, ¶ 89. Substantive unconscionability addresses whether the agreement's terms are "so one-sided as to oppress or unfairly surprise an innocent party." *Kinkel*, 223 Ill. 2d at 28.

¶ 38    The trial court decides whether a premarital agreement is unconscionable as a question of law (750 ILCS 10/7(c) (West 2018)), and we review that finding *de novo*. *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006). To the extent that the trial court made findings of fact on the issue of unconscionability, we review those factual findings under the manifest weight of the evidence standard. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 86. A trial court's factual findings are against the manifest weight of the evidence "if the opposite conclusion is clearly evident." *Van Dyke v. White*, 2019 IL 121452, ¶ 68.

¶ 39    Regarding procedural unconscionability, we consider it significant that when Irmana executed the Agreement, she: (1) did not know what was going on; (2) did not and could not understand what she was signing and its terms; (3) could read English "very, very little;" (ROP, p. 229) (4) signed a contract that was in a language foreign to her; and (5) was told that the Agreement

gave each party what they had before the marriage and they would split what was acquired during the marriage. The trial court's factual findings that Irmana consulted with an attorney after she had already signed the Agreement, and she was not represented by independent counsel, but one that Eldar selected and paid for, was not against the manifest weight of the evidence. Irmana also signed the Agreement two days before the wedding, depriving her of a reasonable opportunity to review or fully comprehend the legal document and to find someone not connected to Eldar to explain the Agreement to her. Based on the facts and the circumstances surrounding Irmana's execution of the Agreement, we find the Agreement procedurally unconscionable.

¶ 40    We also find the Agreement substantively unconscionable. When Irmana executed the Agreement, she had no assets, no income, and was financially dependent on Eldar. Despite Irmana's inability to financially support herself when she signed the Agreement, there was no provision in the Agreement providing her with maintenance, distribution of property, or increase in the value of marital property acquired during the marriage. Under these facts, the $30,000 lump sum distribution was insufficient to deem the Agreement's actual terms overall fair and instead, the Agreement was "harsh, oppressive, [and] inordinately one-sided," rendering it substantively unconscionable.

¶ 41    Having found the Agreement unconscionable, we turn next to address whether Irmana met her burden of establishing the other statutory factors of section (a)(2) of the Act, that she: (1) did not receive a "fair and reasonable disclosure," (2) did not voluntarily waive the right to disclosure, and (3) lacked an adequate knowledge of Eldar's property and financial obligations. 750 ILCS 10/7(a)(2) (West 2018); *Woodrum*, 2018 IL App (3d) 170369, ¶ 57.

¶ 42    First, the "fair and reasonable disclosure" requirement focuses "on the disclosure actually made, and not on the language of the agreement." *Woodrum*, 2018 IL App (3d) 170369, ¶ 63. The

facts and circumstances of each case determines whether there was a "fair and reasonable" disclosure. *Id.* ¶ 66.

¶ 43       Eldar argues that his disclosure of his annual income of $90,000 and net worth valued between $750,000 to $1 million was a "fair and reasonable disclosure of property." We disagree.

¶ 44       Although the Agreement listed Eldar's "specific sole property," no value was separately assigned to those properties to determine the reasonableness of disclosure and other financial assets, such as bank account balances, were not separately disclosed. Eldar disclosed his net worth in the broad range of $750,000 to $1 million, but he provided no information regarding the value of the individual assets comprising that range. Moreover, as Eldar testified, the financial statements referenced in the Agreement were not attached for Irmana's review. See *Woodrum*, 2018 IL App (3d) 170369, ¶ 65 ("[t]he duty is one of disclosure and not one of inquiry"). Based on the overly broad and generalized nature of Eldar's disclosures, Irmana did not receive a "fair and reasonable disclosure" of his financial interests.

¶ 45       Next, we find that there was no waiver. Eldar points to the Agreement's "Full Disclosure" provision, which states: "Each party has made independent inquiry, to his or her own satisfaction, into the complete financial circumstances of the other, and acknowledges that he or she is fully informed of the income, assets and financial prospects of the other." (Appendix, p. 10) Importantly, the Agreement's provision focuses on Irmana being "fully informed" versus Eldar's obligation to provide "full disclosure," unless such disclosure was waived. The Agreement's "Full Disclosure" provision did not sufficiently track the language of subsection (a)(2)(ii) to constitute an effective waiver of the right to disclosure of assets. See contra *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 46 (waiver "faithfully tracked the language of subsection (a)(2)(ii)").

¶ 46       Turning to the last statutory requirement of the Act, we find that Irmana "did not have, or reasonably could not have had, an adequate knowledge" of Eldar's property. 750 ILCS 7(a)(2)(iii)

(West 2018). For purposes of the Act, adequate knowledge "is knowledge that a party has, or reasonably could have had, regarding the general approximation of the other party's income, assets, and liabilities." *Woodrum*, 2018 IL App (3d) 170369, ¶ 82.

¶ 47    Here, given the short duration of their courtship (five months) and that they lived separately during the vast majority of their courtship, along with the limited amount of time Irmana lived in the United States and the lack of Eldar's financial statements, Irmana did not have or reasonably could not have had an "adequate knowledge" of Eldar's property or lifestyle. See contra *Woodrum*, 2018 IL App (3d) 170369, ¶ 80 (wife had "adequate knowledge" of husband's property where they lived together for six years prior to marriage and husband provided written financial disclosure). Nothing in the record supports a finding that Irmana knew or could have known of Eldar's finances even without adequate disclosure by him.

¶ 48    In sum, because Irmana met her burden of establishing all of the requirements of section 7(a)(2) of the Act, the Agreement was unenforceable. We next address the arguments that Eldar makes in the alternative.

¶ 49                               B. Maintenance

¶ 50    Eldar claims that the trial court erred in disregarding Irmana's waiver of maintenance, finding that in the absence of maintenance she would suffer undue hardship.

¶ 51    The Act "provides an exception to enforcing the terms of a premarital agreement that eliminates spousal support where not receiving spousal support (maintenance) would cause 'undue hardship in light of circumstances not reasonably foreseeable at the time of the execution of the agreement.' " *Woodrum*, 2018 IL App (3d) 170369, ¶ 97 (quoting 750 ILCS 10/7(b) (West 2016)). We will not reverse the trial court's finding of hardship unless it is contrary to the manifest weight of the evidence, which occurs when the opposite conclusion is clearly evident. *In re Marriage of Barnes,* 324 Ill. App. 3d 514, 523 (2001); *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The trial court's

award of maintenance is reviewed for an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005); *In re Marriage of Juiris*, 2018 IL App (1st) 170545, ¶ 23. An abuse of discretion occurs "only where no reasonable person would take the view adopted by the trial court." *Schneider*, 214 Ill. 2d at 173. The party seeking reversal of a maintenance award bears the burden of demonstrating an abuse of discretion. *Id.*

¶ 52        The trial court did not abuse its discretion in awarding maintenance to Irmana. When the Agreement was executed, there was a gross disparity between the income and assets of the parties, as well as earning potential. Though she later worked at Target, Irmana gave her paychecks to Eldar and there is no evidence in the record that Irmana acquired substantial savings during the marriage. Irmana was the children's primary caregiver, making it difficult for her to find full-time employment. The trial court properly considered Irmana's realistic present and future earning capacity, lack of vocational skills, and low employability. Thus, to avoid undue hardship, the trial court did not err in circumventing the Agreement's clause precluding any maintenance by awarding Irmana $2,903 in monthly maintenance for 28 months.

¶ 53        Alternatively, Eldar claims that the maintenance award should be reduced because (1) no income was imputed to Irmana relating to her voluntary underemployment and (2) he was entitled to a credit for temporary maintenance paid.

¶ 54        Imputing income to a party is proper where "the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. Imputing income applies to cases of "voluntary unemployment or voluntary *under*employment." (Emphasis in original.) *Id.* We review a trial court's decision of whether to impute income for an abuse of discretion. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 43. As stated, an abuse of

discretion occurs "only where no reasonable person would take the view adopted by the trial court." *Schneider*, 214 Ill. 2d at 173.

¶ 55 The trial court did not abuse its discretion in declining to impute any income to Irmana. Even apart from the fact that she was not the payor of maintenance, her availability to work was limited because she was the children's primary caregiver, lacked any specialized job training, and had no education past a high school degree earned in Bosnia. See *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 49 (wife's proven ability to earn an appropriate salary is a relevant consideration in deciding maintenance and underemployment); *In re Marriage of S.D.*, 2012 IL App (1st) 101876, ¶¶ 36–37 (income imputed to spouse who had recently earned a master's degree). Irmana also asked for additional hours at Target on days that she did not have the children. Moreover, there was no evidence in the record that Irmana avoided any viable employment opportunities. *Ruvola*, 2017 IL App (2d) 160737, ¶¶ 41-42.

¶ 56 In its discretion, the trial court may provide a credit for temporary maintenance paid against the duration of a maintenance awarded. 750 ILCS 5/504 (b-1)(1.5) (West 2018). Given the disparity in income and assets between Eldar and Irmana, along with her responsibility as primary caregiver to their children, we do not find that the trial court abused its discretion in declining to credit the temporary maintenance that Eldar paid against the $2,903 monthly maintenance award.

¶ 57 C. Rule 215(a) Evaluation

¶ 58 Next, we address whether there was a basis for the trial court to order a Rule 215(a) (eff. March 28, 2011) evaluation of Eldar and to suspend his parenting time until completion of that evaluation. Eldar claims that the trial court lost jurisdiction to order the Rule 215(a) evaluation because it was not entered "within a reasonable time before trial."

¶ 59 Rule 215(a) states:

"In any action in which the physical or mental condition of a party or of a person in the party's custody or legal control is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination by a licensed professional in a discipline related to the physical or mental condition which is involved." Ill. S. Ct. R. 215(a) (eff. March 28, 2011).

¶ 60    Here, although the trial court had entered the judgment dissolving the marriage, issues relating to parenting time remained in controversy. Because sufficient evidence had been presented throughout the divorce proceedings regarding Eldar's alleged emotional abuse and inability to support the children emotionally, discovery of additional facts was necessary for the trial court to decide issues involving his parenting time with the children. See *In re Estate of Silverman*, 257 Ill. App. 3d 162, 171 (1993) (the purpose of Rule 215 "is to allow discovery that will assist the trier of fact in reaching its determination"). Based on the evidence in the record, the trial court did not err in find that it was in the children's best interest for Eldar to undergo a Rule 215(a) evaluation and to suspend his parenting time until completion of that evaluation.

¶ 61    Alternatively, Eldar claims that the physician selected to perform the Rule 215(a) evaluation was not an "impartial medical examiner," because he had prior involvement in this case and the cost for the required examination should be allocated to the court, not him. We disagree.

¶ 62    Importantly, the trial court ordered a Rule 215(a) evaluation and not a Rule 215(d) evaluation. Although an evaluation under Rule 215(d) requires an "impartial medical examiner" "where conflicting medical testimony, reports, or other documentation has been offered," the same is not expressly required in Rule 215(a). Ill. S. Ct. R. 215(a), 215(d) (eff. March 28, 2011). Likewise, Rule 215(d), and not Rule 215(a), permits, under limited circumstances, allocation of the cost for the evaluation to the court. See Ill. S. Ct. R. 215(d)(5) (eff. March 28, 2011) (the impartial medical examiner's report and testimony at trial shall be "without cost to the parties").

¶ 63                    D. Rule 219(c) Sanctions and Property Distributions

¶ 64            Eldar argues that the trial court abused its discretion when it imposed Rule 219(c) sanctions, barring him from maintaining any defense or offering any evidence addressing the loan on his Caterpillar retirement account and the two promissory notes, which he claims were directly relevant to the distribution of the marital estate.

¶ 65            Under Rule 219(c), a trial court may exercise its discretion and impose sanctions, including barring witnesses from testifying, when a party fails to comply with discovery rules. Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002); *Palos Community Hospital v. Humana, Inc.*, 2020 IL App (1st) 190633, ¶ 37. The following factors are relevant when determining whether the trial court abused its discretion in imposing a sanction, but no single factor is determinative: "(1) the surprise to the adverse party, (2) the prejudicial effect of the witness's testimony, (3) the nature of the testimony, (4) the diligence of the adverse party, (5) the timeliness of the objection, and (6) the good faith of the party seeking to offer the testimony." *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993); *In re Marriage of Sadovsky*, 2019 IL App (3d) 180204, ¶ 35. Imposition of a Rule 219(c) sanction depends on the facts of each case. *Sadovsky*, 2019 IL App (3d) 180204, ¶ 35.

¶ 66            The facts of this case support the trial court's ruling imposing Rule 219(c) sanctions. During the protracted four-year divorce proceedings, Eldar repeatedly failed to comply with discovery requests. Rather than demonstrate good faith and tender discovery on a timely basis, he waited until less than a week before the scheduled trial date to produce supplemental discovery, which included debts purportedly incurred the previous day. Eldar's untimely production prejudiced Irmana. Under these facts, the trial court's ruling barring Eldar's testimony and any defense concerning those untimely produced documents was not an abuse of its discretion.

¶ 67            Finally, Eldar argues that the trial court erred in its characterization and distribution of the marital estate. Specifically, Eldar claims that the following distributions were made in error: (1)

$166,513 to him as a previously received distribution because those funds were used to pay both parties' attorney fees; (2) the 1305 S. Michigan Avenue property and the two parking spaces to Irmana because that property was acquired before the marriage; (3) the taxicab company, including the medallion and a MV1 automobile, to Irmana because that property was acquired before the marriage; and (4) the 2007 Chevrolet Impala to him because that vehicle "was in the junk yard."

¶ 68        Under section 503(d) of the Illinois Marriage Dissolution Act (750 ILCS 5/503(d) (West 2018)), the trial court must divide marital property in "just proportions," applying the relevant statutory factors. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. But nothing requires the trial court to divide marital property equally between the parties and a "just proportion" division rests on the facts of each case. *Id.*; *In re Marriage of Orlando*, 218 Ill. App. 3d 312, 319 (1991). We review the trial court's final distribution of marital property for an abuse of discretion. *In re Marriage of Polsky,* 387 Ill. App. 3d 126, 135 (2008). Again, a trial court abuses its discretion "only where no reasonable person would take the view adopted by the trial court." *Schneider*, 214 Ill. 2d at 173. A trial court's classification of property as marital or nonmarital will not be disturbed unless its determination is against the manifest weight of the evidence, which occurs "if the opposite conclusion is clearly evident or the findings are unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Vondra*, 2016 IL App (1st) 150793, ¶ 13.

¶ 69        During the divorce proceedings, repeated requests were made for documentation supporting the classification of the 1305 S. Michigan Avenue property and the taxicab business as nonmarital property, but Eldar failed to produce any documentation, resulting in the proper classification of those properties as marital. See *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 51 (the party claiming that the property is nonmarital bears the burden of rebutting the presumption that property acquired during the marriage is marital by clear and convincing evidence, and any doubt as to the classification of property favors a finding that the property is

marital property). As to the distribution of the marital estate, the record establishes that the trial court considered all aspects of the parties' economic circumstances and applied the relevant section 503(d) factors when distributing the marital estate. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. Thus, there is no basis to disturb the trial court's allocation of the marital property, including the $166,513 to Eldar as a previously received distribution or the 2007 Chevrolet Impala.

¶ 70                                             CONCLUSION

¶ 71        For the reasons stated, the trial court's judgment is affirmed in its entirety.

¶ 72        Affirmed.