2023 IL App (3d) 200195

Opinion filed August 11, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| WILLIAM A. AMYETTE, | ) | Rock Island County, Illinois. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-20-0195 |
| and | ) | Circuit No. 17-D-337 |
| | ) | |
| JEANNE M. AMYETTE, | ) | |
| | ) | The Honorable |
| Respondent-Appellee. | ) | James G. Conway, Jr., |
| | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Albrecht and Davenport concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        The petitioner, William Amyette, filed a petition for dissolution of his marriage to the

respondent, Jeanne Amyette. Regarding property distribution, issues arose regarding the

prenuptial agreement the parties signed three days before they were married. On the disputed

property issues, the circuit court found, in part, that the premarital agreement's maintenance

waiver and its designation of the marital residence as William's nonmarital property were

unenforceable. On appeal, William challenges both findings and their associated financial

rulings. We affirm in part, reverse in part, and remand with directions.

## I. BACKGROUND

In September 2017, William filed a petition for dissolution of his marriage to Jeanne. William amended his petition in October 2017 to include a prenuptial agreement (Agreement) the parties had signed three days before their wedding in August 1996.

The Agreement contained, *inter alia*, several provisions related to real and personal property owned by each of the parties prior to their marriage. Provision two stated, in relevant part:

> "It is mutually declared that it is the intention of the parties that by virtue of said marriage neither one shall have or acquire any right, title, or claim in and to the real and personal estate of the other owned prior to the date of this marriage or any other personal or real property acquired in one party's name alone during the course of this marriage ***."

Provision three stated:

> "It is mutually agreed by and between the parties hereto that all property acquired before the date of the marriage as owned by each party, and all property acquired during the course of the marriage and placed in the name of one party alone, shall be considered as non-marital property under the Illinois Marriage and Dissolution Act [*sic*]. However, all property acquired during the course of the marriage and placed in names of both parties shall be considered marital property under the Illinois Marriage and Dissolution of Marriage Act."

Provision eight stated that "in the event of the dissolution of the parties, each party agree [*sic*] to waive any claim to alimony, maintenance or support money from the other. Each party acknowledges that they have sufficient ability and means to support themselves."

¶ 5 The Agreement also contained two exhibits that listed each of the parties' real and personal property. William's assets included a house at 2134 9th Street in East Moline (hereinafter the East Moline house) at $127,000 (less a mortgage for $40,000). Jeanne's assets included a house at 2219 Claussen in Davenport, Iowa (hereinafter the Davenport house), at $50,000. The Agreement was silent regarding any contributions made during the marriage by one party from his or her nonmarital property to the other party's nonmarital property.

¶ 6 After it became clear that Jeanne was going to contest the validity of the Agreement, William filed a motion for declaratory ruling in August 2019, in which he asked the circuit court to find that the Agreement was valid and enforceable. The circuit court held a hearing on William's motion in October 2019. Jeanne testified that William first discussed a prenuptial agreement with her just days before they were to be married. She stated that they had gone to see William's family attorney about their wills, so she was surprised and confused when William began talking about a prenuptial agreement. William's attorney asked Jeanne to write a list of her assets. She felt pressured, and William got upset with her for the time she was taking.

¶ 7 The parties returned to William's attorney's office within a day or two—on August 28, 1996—and signed the Agreement. Jeanne, who had a high school education, read the document but did not understand many of its terms. She did not have an opportunity to discuss the matter with an attorney. She believed the importance of the document was to list their assets going into the marriage.

3

¶ 8        William purchased the East Moline house, and one week before the wedding, Jeanne and her two minor children moved in with him. William had recently sold his own house, and Jeanne was in the process of selling her Davenport house.

¶ 9        To purchase the East Moline house, William borrowed $40,000 from his father. The parties had come to an understanding that when Jeanne's Davenport house sold, they would use that money to pay William's father back. The Davenport house sold in January 1997, and the $40,000 in proceeds from that sale was, in fact, given to William's father. The parties agreed at that time that Jeanne's name would be placed on the deed for the East Moline house. While William said he would get around to doing so, he never did.

¶ 10        William testified that in late 1995, when he and Jeanne discussed getting married, he told her that one of the conditions to him agreeing to do so would be a prenuptial agreement. He did not approach his attorney about drafting a prenuptial agreement until August 1996. At that time, he owned a house at 439 52nd Street in Moline. He sold that house approximately two weeks before he closed on the East Moline house, which was intended to be the marital residence.

¶ 11        William stated that Jeanne was not surprised when the matter of a prenuptial agreement was raised with William's attorney "[b]ecause she was told ahead of time that it was for wills and the prenup, and she said, 'Oh, I didn't think you were serious,' harking back to the conditions of becoming engaged." He clarified that he told Jeanne about the purpose of the meeting with his attorney "[l]ess than a week" before the meeting took place.

¶ 12        William also testified that he never told Jeanne that he would put her name on the deed to the East Moline house. He claimed that he could not recall whether he and Jeanne had discussed what would happen with the proceeds from the sale of her Davenport house. When asked about who made the decision to pay his parents with those proceeds, he answered, "I would say both of

4

us." However, he admitted that, in his deposition, when he was asked how the decision to pay his parents arose, he answered, "I planned to pay my parents off very quickly, no matter what, in my mind."

¶ 13    Regarding their asset lists, William stated that he and Jeanne composed them at home, not at the attorney's office. When they were in the attorney's office to sign the Agreement, Jeanne did not say that she felt coerced into signing.

¶ 14    The circuit court issued a ruling on William's motion in December 2019. The court found that (1) Jeanne was not credible regarding her contention that she was coerced into signing the Agreement, (2) Jeanne had the opportunity to consult with another attorney about the Agreement but chose not to do so, (3) Jeanne's Davenport house was her nonmarital property, (4) there was no evidence that Jeanne intended to gift the $40,000 from the sale of her Davenport house to William's nonmarital estate, (5) because William took Jeanne's $40,000 to pay off his parents for the loan on the East Moline house, Jeanne became a co-owner of a tenancy in common of that house and was entitled to a share of no less than $40,000 in its equity, (5) the East Moline house was therefore marital property, and (6) the Agreement was valid regarding the listed assets of the parties, except for the East Moline house. Alternatively, the court also found that it was both unconscionable and a violation of a fiduciary duty for William to fail to put Jeanne's name on the title to the East Moline house. In that regard, the court found that William had a "premeditated, undisclosed *intention* to take control and use [Jeanne's nonmarital property] money to pay off a loan (from his family) while leaving sole title to the real estate in his name." (Emphasis in original.)

¶ 15    Jeanne filed her original financial affidavit on January 25, 2018. She listed her gross monthly income as $2382.44 and her net monthly income as $1887.52. She claimed $2255.89 in

5

total monthly living expenses ($530.84 in household expenses; $691.99 in transportation expenses; $457.16 in personal expenses; $226 in child-related expenses; and $349.90 in debt payments). Her monthly household expenses consisted of a telephone bill and pet care, as well as groceries, household supplies, and toiletries. Her monthly transportation expenses in section 13 of the form included a $349.90 car payment, which she listed a second time as a debt payment in section 14, even though the form specifically stated, "[d]o not include debt payments previously listed in 13 above, such as your mortgage payment or car payment."

¶ 16        William filed his financial affidavit on October 9, 2018.

¶ 17        Jeanne filed an amended financial affidavit on January 13, 2020, which listed her gross monthly income as $2743.63 and her net monthly income as $2143.25. She claimed $3279.09 in total monthly living expenses ($2153.84 in household expenses, $342.09 in transportation expenses, $477.16 in personal expenses, and $306 in child-related expenses). Unlike her original financial affidavit, Jeanne claimed amounts for mortgage or rent ($829), real estate taxes ($264), homeowner's or renter's insurance ($100), gas ($50), electric ($150), cable or satellite TV ($80), water and sewer ($25), garbage removal ($25), and necessary repairs and maintenance to my property ($100). She no longer claimed a car payment in her monthly transportation expenses or debt payments.

¶ 18        The parties filed their joint pretrial memorandum on January 14, 2020, which stated that (1) Jeanne's version of her monthly net income was $2143.25, (2) William's version of Jeanne's monthly net income was $2343.25, (3) Jeanne's version of her total monthly expenses was $3539.09, and (4) William did not know Jeanne's total monthly expenses.

¶ 19        The case went to trial over two dates in January and March 2020. A substantial portion of the testimony presented on those two dates is irrelevant to the issues raised in this appeal.

¶ 20          Notably, during the trial, the attorneys had a discussion with the court regarding the $40,000 William owed Jeanne as a result of the court's December 2019 ruling. William's attorney stated that "we knew that the respondent would not receive less than [$]40,000, that's already been paid." He added that Jeanne needed the money to find a new home. The parties had struck an agreement for William to pay Jeanne $40,000 by January 31, 2020, and for her to move out of the East Moline house by March 31, 2020. Jeanne had also agreed to pay William $500 per month if she continued to live in the East Moline house past March 31, 2020; that amount would be considered "an advance on the home equity."

¶ 21          Jeanne testified at trial that at the time the parties got married, she was working as a scheduler at Sears Manufacturing and made approximately $25,000 per year. During the 23-year marriage, she had come to depend on William's income to meet financial expenses. She did not lead a lavish lifestyle, and she gave examples of her frugality such as shopping at Goodwill, receiving clothes from her sisters, using coupons, and sharing rides and hotel expenses with mothers of daughters who participated in intercollegiate swimming with the parties' daughter. She also commented on how she still used a couch that she purchased back in 1987.

¶ 22          Further, Jeanne testified that she and William combined their income in a joint bank account during the marriage until 2013, when he separated their finances. Prior to 2013, the joint bank account was used to pay bills, including those related to the East Moline house. She did not have any documentation with her to show that her paychecks had been deposited in a joint account.

¶ 23          Jeanne, who was 61 years old at the time of trial, also testified that she suffered from mandibular bone loss, such that she was told by a dentist three to four years prior that her teeth would need to be replaced. She also stated that she had been diagnosed with squamous cell skin

7

cancer on her arm, for which she had surgery in September 2019 and for which she had routine checkups with her dermatologist every six months. Further, she testified that she suffered from orthostatic neurogenic syncope, which resulted in her having periodic issues with low blood pressure and fainting.

¶ 24     Jeanne stated that she was employed as the aquatics director at Black Hawk College. She had only completed high school but was still given the position, despite it typically requiring a bachelor's degree, due to her lengthy parttime and fulltime employment history at Black Hawk College as a water aerobics instructor. She testified that she took a total of 12 class hours at the school when the parties' daughter was approximately six years old, but William did not support her efforts to advance her education. She also "pretty much had to take [the parties' daughter] with me to classes," which was stressful, so she stopped taking classes. She was three years away from becoming vested in the state educational retirement system and was asking for maintenance at least until that time.

¶ 25     During the last day of trial, William testified that sometime between May and September 1996, he wrote a check to Jeanne for $25,000 to pay down the mortgage on the Davenport house. He presented carbon receipts from checks issued in 1996, but nine were missing. He believed that one of those missing carbons would have been the receipt from the $25,000 check.

¶ 26     The circuit court issued its written decision on April 27, 2020. In part, the court noted that the case had been "replete with internal testimonial contradictions and inaccuracies in a self-defeating behavior by both parties." Accordingly, the court found itself "alerted to the possibility and highly likely need to litigate" whether the statutory hardship exception should apply to the parties' waiver of maintenance.

¶ 27        In addressing William's argument that the parties' present circumstances were reasonably foreseeable at the time they signed the Agreement, the court cited statistics on the likelihood of divorce in first and second marriages, which had not been entered into evidence at trial. The court cited this data in rejecting William's claim that the marriage was destined to fail, along with noting the fact that the marriage had lasted over 20 years and that William himself was the one who filed for dissolution.

¶ 28        Next, the court considered William's claim that the hardship exception was intended to apply only in cases involving some type of serious physical disability. The court questioned if William thought that "the Legislature did not intend to protect lower-earning payees after long marriages from less dramatic, but serious, suffering, *e.g.*, imminent financial insolvency." In rejecting William's claim, the court noted that Jeanne was facing insolvency. The court emphasized that while Jeanne was only five years from optimal Social Security age, William still had "over 11 years to continue to increase his [nonmarital property] retirement assets while maintaining a solid middle-class lifestyle."

¶ 29        Further, the court cited a dictionary definition of hardship and noted that the statute required *undue* hardship. The court found that "[w]here a payee's fundamental financial insolvency, after divorce, is mathematically demonstrable as being very likely unable to avoid homelessness (or even a life in sub-standard housing, an *undue hardship* is present." (Emphasis in original.) The court then used that standard in looking at the evidence presented at trial.

¶ 30        First, the court noted that the parties' financial affidavits, testimony, and exhibits contained "substantial inconsistencies between certain entries and later-given answers." Second, the court listed what it considered to be the most credible and useful numbers. Using Jeanne's amended financial affidavit, the court found that Jeanne's net monthly income was $2143.25.

After finding that Jeanne overstated her total monthly living expenses in her amended financial affidavit, the court found that using her original financial affidavit's reported total monthly living expenses of $2255.89 was appropriate. Thus, the court's calculations were as follows: (1) Jeanne's baseline net monthly deficit was $112.64, (2) added to that deficit was an estimated new house payment of $800 to $1000 for a subtotal deficit of $912.69 to $1112.64, (3) Jeanne's monthly attorney fee payment from the case would be approximately $150 to $200,[1] and (4) Jeanne's "Realistic Monthly Deficit" was $1062.64 to $1312.64. The court also noted that Jeanne also had the responsibility of providing for her 22-year-old unemployed undergraduate daughter. Under those circumstances, the court found that Jeanne was in fact facing undue hardship.

¶ 31    The court then concluded the following:

> "Here, [Jeanne's] lifestyle with William was indisputably modest. Her current earnings remain static. She will be housing the college-age daughter. There is no history of luxury with lifestyle to overcome. [William] concedes this in his testimony.
>
> The Court has considered the factors enumerated as Section 504(a)(1) through (a)(14). The Court places greatest weight on Section 504(a)(2) [[Jeanne's] needs] in light of Section 10/7(b).
>
> The Court FINDS and CONCLUDES that on this record an Award of Maintenance is appropriate. The Court also CONCLUDES that applying the amended guidelines formula is appropriate.

---

[1]The court found in its order that Jeanne had the ability to pay her attorney fees. The court also "invite[d] [Jeanne] and her Attorney to consider a reasonable monthly payment, *e.g.*, $150 - $200 per month) of that balance."

10

The Court has reviewed [Jeanne's] Exhibit EE[2] calculations and CONCLUDES it is correct. Enter an Order that [William] shall pay [Jeanne] maintenance in the sum of $1,314 per month.

Further the Court FINDS that pursuant to amended Section 504 (b-1) that based on the 23-plus year length of the marriage that it is ORDERED that duration of these payments shall be for an Indefinite Term."

¶ 32 William appealed.

¶ 33 II. ANALYSIS

¶ 34 A. Maintenance

¶ 35 1. *Impact of Premarital Agreement*

¶ 36 William's first argument on appeal is that the circuit court erred when it ruled that the "undue hardship" provision of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2018)) applied to preclude enforcement of the Agreement's prohibition on maintenance awards.

¶ 37 Section 7(b) of the Illinois Uniform Premarital Agreement Act (750 ILCS 10/7(b) (West 2018)) provides:

"If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement undue hardship in light of circumstances not reasonably foreseeable at the time of the execution of the agreement, a court,

---

[2]This court believes that "Exhibit EE" was a scrivener's error, as it was Jeanne's exhibit DD that contained her maintenance calculations based on section 504 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504 (West 2018)).

> notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid such hardship."

We review whether undue hardship arose from circumstances not reasonably foreseeable at the time a premarital agreement was signed under the manifest-weight-of-the-evidence standard. *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 523 (2001).

¶ 38    William focuses his argument on his belief that, at the time the parties signed the Agreement, it was reasonably foreseeable that the parties would get divorced. This claim lacks merit. First, it is difficult to conceive of a rational reason why William would enter into a marriage that he reasonably believed would fail or why he would remain in such a doomed relationship for over 20 years. Second, not only is there no evidence of inevitable dissolution in the record, but the issue is also not simply whether a divorce was foreseeable. The statute focuses on the totality of the circumstances at the time of the divorce *and* whether those circumstances were reasonably foreseeable at the time the parties executed the Agreement.

¶ 39    Here, Jeanne entered into the marriage in 1996 having only a high school education and was making approximately $25,000 per year. While she attempted to advance her education during the marriage, William did not support her, so she was forced to stop taking classes. She stopped working for a time while the parties' daughter was a child, and she eventually went back to work parttime. She was able to secure a fulltime position with Black Hawk College and made $35,237.47 in 2019. Taking inflation into account, she was technically making less money in 2019 than she was in 1996.[3] She was also still providing housing and support for the parties'

---

[3] According to the Consumer Price Index Inflation Calculator on the United States Bureau of Labor Statistics website, $25,000 in August 1996 had the same buying power as $40,841.39 in December 2019. *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 2, 2023) [https://perma.cc/F77L-UMMH].

12

college-age daughter at the time of the divorce. Additionally, she had significant dental issues that would ultimately require total replacement of her teeth. Contrary to William's assertions, we find that there was in fact sufficient evidence presented that Jeanne's circumstances at the time of the divorce were not reasonably foreseeable at the time the parties executed the Agreement. Accordingly, we hold that the circuit court's determination that undue hardship precluded a denial of maintenance was supported by the manifest weight of the evidence.

¶ 40　　　　William next pivots to a claim that the circuit court erred when it found that Jeanne would suffer undue hardship if the Agreement's maintenance waiver provision were given effect. Essentially, his claim is based on his belief that the court failed to acknowledge the change in the parties' income and assets over the duration of the marriage—namely, his claims that his assets went from $90,200 before the marriage to $46,291.03 after; Jeanne's assets went from $13,700 before the marriage to $111,756.72 after; and Jeanne's income went from $22,291 before the marriage to $35,237.47. William notes that his asset calculations omitted the value of the parties' respective vehicles. He also acknowledges that his income was $102,042 after the marriage, but he claims he did not know what his income was before the marriage.

¶ 41　　　　William's argument is nothing more than a request for this court to reweigh the evidence, which is not the proper function of a reviewing court. See *In re Marriage of Smith*, 172 Ill. 2d 312, 324-25 (1996). Absent a proper argument supporting a claim that the circuit court's "undue hardship" determination was against the manifest weight of the evidence, there is no basis on which this court could find that the court's determination was erroneous. Accordingly, we reject William's claim.

¶ 42                              2. *Calculation of Maintenance Amount*

¶ 43         Lastly, William argues that the circuit court erred in its calculations of the amount and

duration of maintenance. Specifically, he claims that the court incorrectly calculated Jeanne's net

monthly income and her total monthly living expenses.

¶ 44         The circuit court's determinations on the amount and duration of maintenance are subject

to review for abuses of discretion. *In re Marriage of Dowd*, 2013 IL App (3d) 120140, ¶ 21. "An

abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful or unreasonable,

or no reasonable person could find as the trial court did." *Id.*

¶ 45         There in fact appears to be a small discrepancy between what Jeanne reported as her 2019

gross income in her amended financial affidavit ($32,561.23) and what her paycheck reported as

her 2019 gross income ($35,237.47). In her amended financial affidavit, it appears Jeanne

reported her "Regular Pay" but failed to report her additional "Contract Earnings" of $2676.24.

Thus, her gross monthly pay was $2936.46, not $2743.63, as she reported. That means she

underreported her gross monthly income by $192.83.

¶ 46         Regarding Jeanne's monthly living expenses, William first argues that the circuit court

should not have allowed $226 in monthly child expenses, as the parties' daughter was not a

dependent by the time of the judgment. We reject this claim outright. The evidence showed that

Jeanne was in fact responsible for providing for the parties' dependent daughter.

¶ 47         Second, William argues that the circuit court should not have allowed $349.90 for a car

payment, as Jeanne was no longer making that payment by the time of the trial. Because that

amount was not listed on Jeanne's amended financial affidavit, it appears that William is correct

that Jeanne no longer had that debt. Compounding the problem is that Jeanne's original financial

affidavit shows she counted her car payment twice, as she had it listed in her monthly

14

transportation expenses in section 13 and also in her monthly debt payments in section 14, even though the instructions for that latter category specifically stated, "[d]o not include debt payments previously listed in 13 above, such as your mortgage or car payment."

¶ 48    However, we also note that Jeanne's original financial affidavit did not claim any amount for mortgage or rent, real estate taxes, homeowner's or renter's insurance, gas, electric, cable or satellite TV, water and sewer, garbage removal, or necessary repairs and maintenance to property. The reason was obvious; the evidence presented at trial showed that Jeanne was not paying anything toward those categories since 2013, when William split the parties' finances. However, due to the divorce, she would have to start paying various amounts in each of those categories because she would no longer be living in the East Moline house. Thus, her amended financial affidavit included amounts for all of those categories, totaling $1523. It was a curious decision, to say the least, that the circuit court chose to adopt Jeanne's original financial affidavit because it had the effect of disallowing Jeanne's basic monthly living expenses, even considering the fact that the court added $800 to $1000 back on for a mortgage payment when it calculated Jeanne's monthly financials.

¶ 49    We agree with the circuit court's findings that many inconsistencies existed between the documents filed by the parties and their testimony during the hearing on William's "motion" and at trial. We can also appreciate that accurately calculating the parties' expenses here is nigh impossible. But the court's decision to wholly adopt Jeanne's original financial affidavit only compounded these problems, rather than providing a fair solution to them. The court's decision to adopt Jeanne's original financial affidavit was the very essence of an abuse of discretion. See *id.*

15

¶ 50	The appropriate remedy for the circuit court's abuse of discretion cannot be for us to perform a simple recalculation of Jeanne's income and expenses and then William's maintenance obligation. There is nothing simple about the maintenance issues in this case. Rather, we believe the appropriate remedy is for the circuit court to undertake a more precise and detailed analysis of the parties' assets and liabilities to ensure the purposes and requirements of the Act are met.

¶ 51	B. The East Moline House

¶ 52	William's second argument on appeal is that the circuit court erred when it refused to enforce the Agreement's listing of the East Moline house as William's nonmarital property and instead found that the parties owned it as tenants in common.

¶ 53	The disposition of property in a dissolution action is governed by section 503 of the Act. 750 ILCS 5/503 (West 2018). Before property can be divided, the circuit court must first determine whether it is marital or nonmarital property. *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 503 (1993). We will not disturb a circuit court's determination of property as marital or nonmarital unless it is against the manifest weight of the evidence. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 68.

¶ 54	In part, nonmarital property includes "property excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement." 750 ILCS 5/503(a)(4) (West 2018). In this case, the Agreement listed the East Moline house as William's nonmarital property. Thus, under section 503(a)(4), that designation remains unless some type of invalidity applies. *Id.* The question raised here is whether the circuit court erred when it found that designation to be invalid.

16

¶ 55        Section 7(a) of the Illinois Uniform Premarital Agreement Act (750 ILCS 10/7(a) (West 2018)) addresses the enforceability of premarital agreements:

> "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
> > (1) that party did not execute the agreement voluntarily; or
> >
> > (2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:
> >
> > > (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
> > >
> > > (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
> > >
> > > (iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

In this case, the circuit court invalidated the designation of the East Moline house as William's nonmarital property based on general equitable principles. However, general equitable principles are not among section 7(a)'s enumerated grounds for invalidating a prenuptial agreement between the parties. Only involuntariness and unconscionability—*i.e.*, specific types of equitable grounds—are enumerated. *Id.* In that regard, we first note that there is no question raised in this appeal regarding whether the parties voluntarily entered into the Agreement. Second, while the circuit court cited unconscionability as an alternative basis for its ruling, we note that the court's

17

unconscionability analysis neither cited a legal definition of unconscionability (see, *e.g.*, *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 85, holding that a premarital agreement, like any contract, "may be unenforceable if it is procedurally unconscionable, substantively unconscionable, or some combination of the two"), nor addressed the specific requirements of section 7(a)(2) regarding unconscionability in this context (750 ILCS 10/7(a)(2) (West 2018)).

¶ 56        Even if general equitable principles were proper grounds for invalidating a premarital agreement—and even if we were persuaded by the circuit court's alternative, unconscionability analysis—the lingering problem with the court's ruling on the designation of the East Moline house is that it focused on an oral agreement that occurred well after the Agreement was executed, *i.e.*, an oral *postnuptial* agreement. The court found Jeanne credible regarding the parties' oral postnuptial agreement that, in exchange for Jeanne using $40,000 from the sale of her Davenport house to pay off William's parents, William agreed to add Jeanne's name to the East Moline house's deed. But Jeanne also testified that the parties' postnuptial agreement occurred in January 1997—that is, five months after the Agreement was executed. Section 7(a) of the Illinois Uniform Premarital Agreement Act clearly states that the enforceability of a premarital agreement is determined *as of the time it is executed*. *Id.* § 7(a). We find no reason to disturb the circuit court's credibility determinations on this matter (see, *e.g.*, *In re D.W.*, 386 Ill. App. 3d 124, 136 (2008), holding that "the trial court, having observed the witnesses and heard their testimony, is in the best position to make credibility determinations") but must hold nonetheless that the court erred when it held that the Agreement was invalid regarding the designation of the East Moline house as William's nonmarital property. The Agreement was in fact enforceable in that regard.

18

¶ 57    We further note that Illinois law prohibits the parties' oral postnuptial agreement regarding the East Moline house from superseding the Agreement. Section 6 of the Illinois Uniform Premarital Agreement Act provides, in relevant part, that "[a]fter marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties." 750 ILCS 10/6 (West 2018). Because the parties' postnuptial agreement was not written, it does not impact the enforceability of the Agreement regarding the East Moline house.

¶ 58    A question remains regarding the $40,000 Jeanne gave to William as a part of their postnuptial agreement. Initially, we note that William attempts to challenge the circuit court's finding that Jeanne proved her $40,000 contribution by clear and convincing evidence. He cites evidence he presented on the third and final day of trial as proof that the evidence on contribution was conflicting at best. That evidence included his claim that he paid Jeanne $25,000 to pay down her mortgage on the Davenport house. However, the circuit court rejected William's claim, finding that (1) he failed to produce his evidence when the court decided the equity issue in December 2019, (2) the incomplete check carbons did not support his claim, and (3) even if they did, the omitted carbons would have undercut the validity of the Agreement as a complete and accurate recitation of each parties' nonmarital property valuations. The court stated that William's signature on the Agreement confirmed that the Davenport house and its equity were in fact Jeanne's nonmarital property. William ignores the circuit court's rejection of his claim and its findings regarding his evidence in his brief on appeal. We will not do so.

¶ 59    We find that the evidence presented by William, and his associated late claim regarding his alleged payment to Jeanne, was properly discounted by the circuit court. The manifest weight of the evidence showed that the sale of Jeanne's Davenport house netted $40,000, which she

19

gave to William to pay off the loan he received from his parents to purchase the East Moline house.

¶ 60        Furthermore, pursuant to section 503(c)(2)(A) of the Act, Jeanne was entitled to reimbursement for her $40,000 contribution to William's nonmarital property. 750 ILCS 5/503(c)(2)(A) (West 2018). That section provides:

> "When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non-marital property that received the contribution." *Id.*

¶ 61        Citing the last sentence from section 503(c)(2)(A), William claims that the circuit court erred when it required him "to reimburse JEANNE from his other non-marital financial assets." Even if this argument was accurate, we would find it to be waived. On the first day of trial, the attorneys informed the court that they had entered into an agreement regarding the $40,000 after the court issued its ruling on William's "motion" for declaratory ruling in December 2019. William agreed to pay Jeanne the $40,000 by January 31, 2020, and she agreed to move out of the East Moline house by March 31, 2020. If she remained, she would pay William $500 per month as "an advance on the home equity." It was noted that William in fact paid Jeanne the $40,000. He cannot now complain about the manner in which he chose to reimburse Jeanne for

her $40,000 contribution. See, *e.g.*, *Hill v. Cowan*, 202 Ill. 2d 151, 158 (2002) (holding that waiver occurs when an individual voluntarily relinquishes a known right).

¶ 62                                    C. Remand

¶ 63        To summarize, we have held that (1) the circuit court did not err when it found that Jeanne was entitled to maintenance, despite the Agreement's maintenance waiver, (2) the court erred when it calculated Jeanne's income and expenses for the purposes of calculating maintenance, and (3) the court erred when it designated the East Moline house as owned by the parties as tenants in common. The consequence of our second ruling is that we direct the court on remand to undertake a more precise and detailed analysis of the calculation of the amount of maintenance to ensure it arrives at a just result. The consequences of our third ruling must also be addressed on remand—namely, because the East Moline house was in fact William's nonmarital property, Jeanne should not have received the additional award of equity from the house of $10,752.81. However, we also note that an issue may exist regarding whether the mortgage on the East Moline house was paid from a joint bank account into which both parties' paychecks were placed until 2013. On remand, the circuit court should also permit the parties to litigate the issue of whether Jeanne is due to receive section 503(c)(2)(A) reimbursements for any contributions she may have made beyond the $40,000 contribution.

¶ 64                                    III. CONCLUSION

¶ 65        The judgment of the circuit court of Rock Island County is affirmed in part and reversed in part, and the cause is remanded with directions.

¶ 66        Affirmed in part and reversed in part.

¶ 67        Cause remanded with directions.

21

*In re Marriage of Amyette*, **2023 IL App (3d) 200195**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Rock Island County, No. 17-D-337; the Hon. James G. Conway Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Jeffrey J. Neppl and Theresa L. Sosalla, of Neppl Law Centre, of Rock Island, for appellant. |
| **Attorneys for Appellee:** | David W. Andich, of Andich & Andich, of Rock Island, for appellee. |